Tammy HIGGINS, Appellant (Defendant),

v.

The STATE of Wyoming,
Appellee (Plaintiff).

No. 93–268.

Supreme Court of Wyoming.

Feb. 13, 1995.

Leonard D. Munker, State Public Defender, Deborah Cornia, Asst. Public Defender, Gerald M. Gallivan, Director, Defender Aid Program, and Tom Sutherland, Student Intern, representing appellant.

Joseph B. Meyer, Atty. Gen., Sylvia L. Hackl, Deputy Atty. Gen., D. Michael Pauling, Sr. Asst. Atty. Gen., Georgia L. Tibbetts, Asst. Atty. Gen., Theodore E. Lauer, Director, Prosecution Assistance Program, Rose Meacham and Bruce Horton, Student Interns, representing appellee.

Before GOLDEN, C.J., and THOMAS, CARDINE,* MACY and TAYLOR, JJ.

TAYLOR, Justice.

A confession exacted from a criminal defendant in violation of applicable constitutional protections is not admissible at that defendant's trial. In this appeal, we are asked to determine if the district court erred in admitting such a confession or, if it was erroneously admitted, whether the error was harmless beyond a reasonable doubt. In addition, appellant contends the State deliberately delayed her appearance before a judge for the purpose of obtaining a confession.

We affirm.

## I. ISSUES

Appellant raises these issues:

I.  Did the trial court err in concluding that Tammy Higgins' confession was the result of a voluntary, knowing, and intelligent waiver of her rights under the Fifth Amendment of the

---

* Retired July 6, 1994.

United States Constitution and under the Wyoming Constitution, Article I, Section Eleven, when there was no readvisement of her rights for the second, third, and fourth custodial interrogations?

II.  Did the trial court err in concluding that Tammy Higgins' confession was voluntary within the meaning of the United States Constitution's Fourteenth Amendment due process clause and the Wyoming Constitution's Article I, Section Six, due process clause, when four different officers attempted to extract a confession from Ms. Higgins over the course of three months, with the last two officers attempting to get a confession from Ms. Higgins for seven to seven and a half hours within an eleven hour period?

(A) Did the timing and circumstances of Officer Hofmeier's arrest constitute an "unnecessary delay" in bringing Ms. Higgins before the judicial officer of the court from which the warrant was issued and as such, constitute a de facto denial of her rights to both an attorney and to due process under both the United States Constitution's Sixth and Fourteenth Amendments as well as under both the Wyoming Constitution's Article I, Sections Six and Ten?

III.  Did the trial court err by misapplying the Wyoming Supreme Court's precedent, when it analyzed the necessity of subsequent Miranda warnings, for subsequent interrogation periods, under the following standard: "the trial court was to make a determination as to the sufficiency of the original warnings and the conduct of the second officer.", when totality of the circumstances is the appropriate standard?

Appellee rephrases the issues:

I.  Did the district court correctly find that the statement made by appellant, following the giving of Miranda warnings which appellant acknowledged that she understood and subsequently waived, was voluntarily, knowingly, and intelligently given, and thus admissible into evidence at trial?

II.  Did the circumstances of appellant's arrest, pursuant to a warrant issued by the county court, and her transportation from the place of her arrest to the court which issued the warrant constitute an unreasonable delay which violated appellant's constitutional rights?

## II.  FACTS

Facts are pivotal in the resolution of any issue of law. This is especially true in this case. A brief overview of the circumstances surrounding the crime will be helpful.

Shortly before midnight on December 6, 1992, Paul Minick (Minick) and his friend Mike Webb (Webb) were traveling along I–90 about twenty miles south of Sheridan, Wyoming. Meanwhile, Tammy Higgins (Higgins) and her friend Rachel Smith (Smith)[1] were cruising I–90 south of Sheridan looking for someone to rob. Their strategy was to find a car with license plates from a distant state, shoot a tire out, and then rob the stranded motorist. Higgins spotted a car with Florida license plates. The car was driven by Minick and Webb. Higgins drove alongside the vehicle and Smith shot out the right rear tire with a rifle. Minick and Webb were only aware that they had experienced a blow-out and they pulled over to effect repairs.

Higgins turned around in the median and headed south and then, once again, turned around in the median and headed north, so as to pull up behind the victims. Higgins shouted from her pickup and asked if the victims needed help. At first, Minick indicated that no assistance was required, but Higgins stayed at the scene anyway. Minick quickly discovered that he had no jack and, indeed, did need help. Webb walked back

---

1.  Rachel Smith was the defendant in a separate criminal proceeding which was treated by this court in *Smith v. State,* 880 P.2d 573 (Wyo.1994).

and talked to the two women, looked in the back of the pickup for tools, and then returned to Minick's car to warm up. Higgins brought a hydraulic jack over to Minick and placed it by his feet. Minick asked Higgins if she had a lug wrench to use with the jack. Higgins returned to her pickup, supposedly to look for the proper tool.

Shortly, both Higgins and Smith returned, indicated that they had no lug wrench, and asked Minick to show them where his spare tire was. As Minick turned around to do that, he felt a tap on his head. When he looked up, Higgins was pointing a black .357 revolver at him. Higgins asked for Minick's money and, at Smith's suggestion, took both Minick's money and his wallet. After this experience, Minick was somewhat frantic, in addition to the fact that he was without the means to repair his tire. He drove to Sheridan on the rim of a wheel and, following road signs, ended up at "Perkins," a restaurant which is open twenty-four hours a day.

In the meantime, Higgins drove to a self-storage unit and dropped off the hydraulic jack, a tool box, and the guns used in the crime. She disposed of the wallet by tearing it up and flushing it down a toilet. Higgins continued to drive around for a time before she and Smith also went to "Perkins" to look for a friend. Minick and Webb were describing the robbery to two sheriff's deputies who happened to be at "Perkins" when they arrived. When Smith walked in the door, Webb immediately pointed her out as one of the women who had committed the robbery. Minick also identified her. Smith turned to leave, but was stopped by the deputies. The deputies brought Higgins into the restaurant and she too was identified by both victims. Some minimal questioning was accomplished at "Perkins," although no Miranda warnings were given at that time. The entire group left the restaurant and went to the Sheridan County Sheriff's office. Higgins was permitted to drive herself there. Minick filled out a statement, but also indicated that he did not want to press charges because he was afraid. Higgins was questioned again, she claims without Miranda warnings. The deputies claim those warnings were read to her at the sheriff's office.

Eventually, Minick did press charges and he brought the right rear wheel from his car to the sheriff as evidence. The wheel had a bullet hole in it. Items of evidence from the pickup, as well as the items which had been left at the storage unit, were eventually seized pursuant to search warrants. At trial, Minick identified Higgins, her vehicle, the hydraulic jack, the stocking cap she wore, and the revolver she used. Webb also identified Higgins, virtually all of the other physical evidence listed above, as well as some additional items which he saw in Higgins' pickup.

Since Higgins gave a full confession, we also know this story from her perspective. That confession is, of course, the centerpiece of this appeal. Higgins identifies a series of errors by the police which she claims necessitate suppression of her confession. First, she was not given Miranda warnings at "Perkins." Second, she was not given Miranda warnings at the sheriff's office on the night of December 6, 1992. We need not analyze those events in detail because no statements from those occurrences were admitted at her trial or otherwise used against her. To the extent she answered questions, it was to deny being involved in the robbery.

Higgins was arrested, pursuant to a warrant, in Casper, Wyoming, on March 10, 1993. She contends she was then subjected to a marathon interrogation session on March 11, 1993, which violated her constitutional rights and resulted in her giving an involuntary confession.

Higgins was questioned by Sheridan County Deputy Hofmeier for about one hour (2:00–3:00 p.m.) at the Casper Police Department. It is undisputed that she was given Miranda warnings in writing before that interrogation. She denied being involved in the robbery and asked to terminate the interrogation. Deputy Hofmeier drove Higgins to Sheridan in her pickup (4:30–6:30 p.m.). She claims Deputy Hofmeier questioned her during that trip. Deputy Hofmeier testified that he did not question her during the trip—that they just visited back and forth. Once in Sheridan, Higgins was questioned by an agent of the Wyoming Division of Criminal Investigation (DCI) (8:30–

10:30 p.m.). Miranda warnings were not repeated verbatim at that time, but Higgins was asked if she remembered being given those warnings and if she understood that they still applied. She claims she responded by saying, "'Okay?' because I really didn't understand what he was saying." The DCI agent claims he verified with Higgins that Miranda warnings had been read to her and that she understood them. Higgins claims that the DCI agent obtained a confession from her by playing on her emotions, by telling her that Smith had already "jumped on the band wagon," and that she was looking at twenty-five years if she did not come clean, but likely a short sentence if she confessed. The DCI agent basically denied those allegations. Higgins repeated that confession to Deputy Hofmeier and the DCI agent and it was tape-recorded (10:45–Midnight).

The district court determined that the confession should not be suppressed. At trial, the district court heard all evidence, including the confession, and, ultimately, found Higgins guilty of aggravated robbery.

## III. DISCUSSION

The prosecution bears the burden of proving that a confession is voluntary. In the face of conflicting evidence, the district court is the arbiter of those facts and must make the initial determination whether that confession is voluntary in the light of all surrounding circumstances. *Dice v. State,* 825 P.2d 379, 387 (Wyo.1992); *Garcia v. State,* 777 P.2d 603, 605–07 (Wyo.1989); *Dodge v. State,* 562 P.2d 303, 308–10 (Wyo. 1977).

Under the factual circumstances present in this case, which we have set out in detail above, the prosecution carried its burden of proof. The district court could readily infer from all the facts presented that the confession was voluntary and we so hold.

Higgins also contends there was unnecessary delay in her being brought before the court which issued her arrest warrant. The record simply does not demonstrate either excessive or deliberate delay in Higgins being brought before a judicial officer.

There is no suggestion in the record that Higgins asked to consult with an attorney or that such a request was denied. In essence, Higgins asks this court to assume that deliberate delay was employed so as to infringe upon her right to counsel. We decline to make such an assumption, particularly where the facts point in the opposite direction.

## IV. CONCLUSION

The judgment and sentence of the district court is affirmed.