874 A.2d 546

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT, v. SHAMSID KNIGHT, A/K/A SHAMSIDDEEN KNIGHT, DEEN KNIGHT, SHAMSID D. KNIGHT, SHAMSID'DEEN ALKABAR ABDULLAH KNIGHT, SHAMSIDDEEN CHAMPT KNIGHT AND SHAMSA DE KNIGHT, DEFENDANT–RESPONDENT.

Argued January 31, 2005—Decided June 8, 2005.

450

*Maura K. Tully,* Deputy Attorney General, argued the cause for appellant (*Peter C. Harvey,* Attorney General of New Jersey, attorney).

*Michael C. Kazer,* Designated Counsel, argued the cause for respondent (*Yvonne Smith Segars,* Public Defender, attorney).

Justice WALLACE delivered the opinion of the Court.

In this appeal we determine whether two trial courts properly denied defendant's separate motions to suppress his incriminating statements. Defendant made his initial statement to the police after being arrested for the fatal shooting of a taxi driver. A short while after his statement about the shooting, defendant admitted his involvement in several robberies. Defendant subsequently made separate motions to suppress those statements. In each case, the trial court denied the motion and found that defendant knowingly, intelligently, and voluntarily gave his statement. Defendant was tried for the shooting of the taxi driver and at the conclusion of his trial, a jury found defendant guilty of first-degree murder and other offenses. Defendant then entered into a plea agreement with the State and pled guilty to several robberies. On appeal, the Appellate Division reversed both convictions after concluding that defendant's confessions were involuntarily obtained. We granted certification and now hold that, under the totality of the circumstances, the trial court properly found that

defendant's statement concerning the shooting was voluntary. We need not address the voluntariness of his confession to the robberies because defendant pled guilty to the robbery charges without reservation. *R.* 3:9–3(f).

## I.

We recite the pertinent facts developed at the hearings on the motions to suppress evidence, at the trial, and at the plea hearing. Between December 28, 2000, and January 23, 2001, defendant, Shamsid Knight, was involved in a series of robberies in Newark. On December 28, 2000, defendant robbed the Hudson City Savings Bank on Seventh Avenue; on January 4, 2001, he robbed the Valley National Bank on Ferry Street; on January 10, 2001, he robbed the Bank of New York at One Riverfront Plaza; and on January 23, 2001, he first robbed the West Market Laundromat while threatening the use of a firearm and then robbed the Gibraltar Savings Bank on South Orange Avenue. In all of those bank robberies, defendant gave the teller a note demanding money and, in the Valley National Bank robbery, defendant threatened the use of a shot gun.

Later on January 23, 2001, defendant was a passenger in a Lincoln Navigator taxi cab. Defendant had the taxi driver take him from a friend's house in Jersey City to New York City to buy drugs. When he returned to New Jersey in the early morning of January 24, 2001, defendant directed the taxi driver to stop at Kim Smith's residence in Newark. Upon arriving at the residence, defendant exited the cab and called for Smith's son to come outside. Smith, peering from the window, recognized defendant and was frightened by his conduct. She called 911 and reported the incident. Defendant returned to the Navigator.

Newark police officers Altemise Scott and Calvin Parkman responded to Smith's 911 call. When they arrived, they observed the Navigator pulling out of the driveway. The officers pursued the Navigator until it eventually pulled to the side of the road. Once the Navigator came to a halt, Officer Parkman exited his

vehicle and approached, when suddenly a shot rang out from the passenger side of the vehicle. Both officers, thinking the shot was directed at them, returned fire. Another shot was fired inside the Navigator, and the vehicle pulled away, swerving down the road and striking the median. After traveling about three blocks, several more shots were fired from the direction of the Navigator. Finally, it stopped and again the officers approached the vehicle where they saw the bloody body of the driver slumped over the steering wheel. Defendant, who was positioned halfway between the driver's side and the passenger's side of the vehicle, was holding a firearm and was wearing only a short sleeve T-shirt and an athletic supporter. The officers instructed defendant to drop the weapon and get down on the ground. Defendant did so. The officers handcuffed defendant and placed him in the patrol car.

At approximately 4:30 a.m., Detective John Melillo arrived at the scene and observed defendant sitting in the patrol car. Defendant remained in the patrol car until he was taken to Newark Police Headquarters for interrogation. At the station, he was given a hospital gown and a pair of socks.

Homicide Investigator Richard Gregory arrived at the scene of the shooting around 5:10 a.m. By then defendant was no longer present. During the investigation, Gregory and Melillo noticed the victim's body was still in the Navigator. In addition, they found a gun and clothes scattered nearby.

Gregory returned to headquarters around sunrise. Before interviewing defendant about the incident, Gregory advised defendant of his *Miranda*[1] rights. Defendant agreed to speak with the police. The precise time the interview began is not in the record, but the initial interrogation concluded around 9:45 a.m., when Gregory left to interview another witness. Gregory returned to continue the interview at around 10:45 a.m.

---

[1] *Miranda v. Arizona*, 384 *U.S.* 436, 86 *S.Ct.* 1602, 16 *L.Ed.*2d 694 (1966).

By 12:00 p.m. Gregory believed he had enough information to take a formal statement. He again advised defendant of his *Miranda* rights and at 12:10 p.m. defendant signed the *Miranda* waiver form. Gregory would later testify that before beginning the formal questions and answers, he gave defendant a soda and a bag of chips. From 12:15 p.m. to 3:20 p.m. defendant gave a statement in question and answer format to Melillo. In that statement, defendant admitted that when the police officers began following the Navigator, he flashed his gun and instructed the driver not to stop the vehicle. He said the driver tried to take the gun from him and a single shot was fired from his gun. He also told the police that he intended to fire the first shot at the driver, which struck the driver on the right side of his head. As the driver slumped over, defendant leaned over to control the vehicle and he fired several accidental shots in the direction of the driver. After the police began shooting at his vehicle, defendant decided to undress and toss his clothes out the window. He explained that he removed his clothes to pretend he had been robbed, and because he was hot from having "smoked a couple of blunts." When he completed his statement around 3:20 p.m., defendant was taken to a cell.

Meanwhile, Detective Michael DeMaio noticed a photograph of defendant on another detective's desk and recognized him as a suspect in several bank robberies. Sometime between 4:15 p.m. and 4:30 p.m., DeMaio visited defendant's cell, advised him of his *Miranda* rights, and displayed a photograph from a bank surveillance camera depicting defendant robbing the bank. Defendant agreed to give another statement. He was again advised of his *Miranda* rights. Conceding that he was the person in the picture, defendant signed the back of the photograph. That interrogation began a few minutes after 4:37 p.m. and lasted until 12:40 a.m. DeMaio and another investigator questioned defendant about five robberies and defendant confessed to four of them.

Defendant's first statement, which related to the January 23, 2001, robbery of the Gibraltar Savings Bank, was given between

4:37 p.m. and 5:40 p.m. DeMaio transcribed the interview by typing the questions and defendant's answers. At some point, defendant was provided with a soda and a turkey sandwich, of which he ate half. Although one of defendant's arms had been handcuffed to his chair during the initial robbery interrogation, the handcuffs were removed during the break. The interview resumed at around 6:30 p.m. and continued until 7:45 p.m. At that time, defendant admitted that two weeks before he had robbed the Bank of New York. Defendant also identified a surveillance photograph that showed him robbing the bank. Following a break between 7:45 p.m. and 8:45 p.m., DeMaio asked defendant additional questions about the handgun he carried during the Bank of New York robbery.

The third statement was taken from 9:15 p.m. to 10:20 p.m. and concerned the robbery of the Valley National Bank on January 4, 2001. The fourth statement was taken between 10:35 p.m. and 11:20 p.m. and concerned the robbery of the Hudson City Savings Bank on December 28, 2000. Defendant again identified a surveillance photograph of himself at the scene of the robbery.

Finally, from 12:15 a.m. until 12:40 a.m., defendant clarified some of his statements about the clothing he wore during one of the robberies. According to DeMaio, defendant was allowed to eat, drink, take a bathroom break, and smoke several cigarettes at various times during the interrogation process.

## II.

### A.

On March 30, 2001, defendant was charged under an Essex County indictment with first-degree murder, *N.J.S.A.* 2C:11–3(a)(1) & (2); two counts of second-degree aggravated assault, *N.J.S.A.* 2C:12–1(b)(1); third-degree unlawful possession of a weapon (handgun), *N.J.S.A.* 2C:39–5(b); second-degree possession of a weapon (handgun) for an unlawful purpose, *N.J.S.A.* 2C:39–4(a); and second-degree eluding, *N.J.S.A.* 2:29–2(b). In a sepa-

rate Essex County indictment, defendant was charged with second-degree conspiracy to commit robbery, *N.J.S.A.* 2C:5–2 and *N.J.S.A.* 2C:15–1; three counts of second-degree robbery, *N.J.S.A.* 2C:15–1; two counts of first-degree armed robbery, *N.J.S.A.* 2C:15–1; third-degree unlawful possession of a weapon (handgun), *N.J.S.A.* 2C:39–5(b); and second-degree possession of a weapon (handgun) for an unlawful purpose, *N.J.S.A.* 2C:39–4(a).

### B.

In June 2002, a *Miranda* hearing was conducted to determine whether defendant's statements concerning the robberies would be admissible at trial on the second indictment. Detective DeMaio testified on behalf of the State and described his role in the taking of defendant's four statements. DeMaio related that he administered *Miranda* warnings before he questioned defendant about the robberies and again before defendant gave his statements confessing to the robberies. Defendant also testified. He told the trial court that, prior to his statements about the robberies, he had been questioned at length about the homicide and had signed a *Miranda* Warning Form around 12:10 p.m. Despite his signed confession, he claimed the entire statement was a lie. He told the court that he had no choice because he felt threatened by the police and their "body language." He testified that he had been asleep when the police stopped the car, and upon awakening, he realized his clothes were gone. Defendant further claimed that in April 2000, DeMaio and Detective Mellilo threatened to frame him for the murder of his friend, Abdul Hudson, if he did not cooperate. Defendant also claimed that Melillo promised him that he would receive probation if he signed the robbery confessions. Finally, defendant complained that during questioning he was cold and miserable, handcuffed to a chair, forced to urinate in a soda can, and was not permitted to contact his grandfather.

The motion court did not credit defendant's testimony and found that he gave a knowing, intelligent, and voluntary waiver of his *Miranda* rights. In support of its findings, the court noted that

defendant had some college education and was familiar with the criminal justice system as a result of his two prior convictions. The court concluded that the State met its burden of proving the voluntariness of defendant's incriminating statements beyond a reasonable doubt.

C.

On September 20, 2002, a different court held a hearing on defendant's motion to suppress his statement about the shooting incident. Investigator Gregory was the sole witness for the State. He stated that in the early morning of January 24, 2001, he saw defendant in the interrogation room. By that time, defendant had been given a scrub suit or a hospital gown because he was not fully clothed when he was arrested. Gregory said he spent hours talking to defendant because defendant kept changing his story. Prior to the written statement, Gregory administered *Miranda* warnings at about 12:05 p.m. and at 12:10 p.m. defendant signed the waiver form. Gregory was sure he gave defendant a soda and a bag of potato chips before defendant gave his statement. He said that Detective Melillo asked the questions and used a type-writer to record the statement. Gregory recalled that defendant never asked for a lawyer to be present and did not appear to be under the influence of drugs. At the conclusion of the statement, defendant signed each page and acknowledged that everything in the statement was true.

Again, defendant denied that the content of his statement was true. He said he unsuccessfully requested to call his grandfather. He claimed that Gregory was fair to him but disagreed that he was given a soda or chips. Defendant proclaimed that it was Gregory who drank a soda and later when Gregory left the room, defendant urinated in the soda can. Defendant also claimed that he was afraid of the police.

In considering the totality of the circumstances, the court found that the measures taken by the police at the scene to secure defendant in the police vehicle were reasonable. The court also

found that defendant's lack of clothing was his own doing and that, at the police station, the police gave defendant a garment to cover himself. While recognizing the time frame for questioning defendant was lengthy, the court found it was not continuous and was not so overbearing as to break the psychological will of defendant. Despite defendant's prior use of marijuana, the court found that defendant understood what he was saying. The court concluded that the State proved beyond a reasonable doubt that defendant knowingly and intelligently waived his *Miranda* rights and that defendant voluntarily gave the statement.

## D.

Following an eight-day trial, a jury convicted defendant of first-degree murder, unlawful possession of a weapon, possession of a weapon for an unlawful purpose, and eluding the police. Prior to the sentencing on those convictions, defendant entered into a plea agreement on the separate indictment arising out of the bank robberies. Defendant agreed to plead guilty to second-degree conspiracy to commit robbery, two counts of first-degree robbery, and three counts of second-degree robbery, in exchange for the State recommending a sentence to run concurrent to the sentence to be imposed on his homicide conviction and dismissal of the two remaining counts in the robbery indictment. During the plea hearing, defendant confirmed that his statements confessing to the robberies were true. Significantly, in that plea, defendant did not reserve the right to challenge on appeal the motion court's finding that defendant's confessions to the robberies would be admissible at trial.

On January 6, 2003, defendant was sentenced for his murder conviction and related charges to an aggregate term of life imprisonment with thirty years of parole ineligibility. Later that same day, the trial court sentenced defendant on the robbery pleas to an aggregate term of twenty years, subject to the No Early Release Act and the Graves Act. That sentence was made concurrent to defendant's life sentence for the murder conviction.

E.

Defendant appealed both judgments of conviction. In a published opinion, the Appellate Division reversed both convictions and remanded for a new trial. *State v. Knight,* 369 *N.J.Super.* 424, 433–34, 849 *A.2d* 209 (2004). The panel deferred to the motion court's factual findings, but rejected the court's conclusion. *Id.* at 439, 849 *A.2d* 209. The panel found that the murder interrogation was coercive, in part, because defendant was held "in a patrol car on a cold [winter] night for at least two hours while wearing only a jockstrap and a T-shirt...." *Id.* at 441, 849 *A.2d* 209. Further, the panel reasoned that

> [s]upplying defendant with a hospital gown at police headquarters was problematical by itself and when considered in conjunction with the length of time he was held incommunicado, the minimal amount of food he was given, the deprivation of sleep, and the persistent questioning in the face of denials, the totality of the circumstances rendered this interrogation inherently coercive....
> [*Ibid.*]

Accordingly, the panel held that defendant's motion to suppress should have been granted. *Ibid.*

Disregarding the fact that defendant did not preserve the issue for appeal, the panel also concluded that defendant's statements regarding the robberies were "tainted by the preceding murder interrogation and exacerbated by the continuation of the inherently coercive circumstances." *Id.* at 434, 849 *A.2d* 209. It reasoned that those confessions began "more than thirteen hours after defendant was taken into custody and continu[ed] for more than twenty hours after defendant's arrest." *Id.* at 442, 849 *A.2d* 209. Further, the panel found that "defendant was inadequately clothed, was held incommunicado, was given minimal food, and was even more seriously sleep deprived than during the murder interrogation." *Ibid.* Therefore, the panel disagreed with the trial court's conclusion that defendant's "age, education and familiarity with the criminal process was sufficient to render his waiver of rights and statements voluntary under the totality of circumstances[,]" even if it were true that defendant was given breaks to eat, use the restroom, and smoke. *Id.* at 443, 849 *A.2d* 209. The

panel remanded for defendant to withdraw his guilty plea and proceed to trial. *Id.* at 434, 849 *A.*2d 209.

We granted the State's petition for certification. *State v. Knight*, 181 *N.J.* 547, 859 *A.*2d 692 (2004).

## III.

### A.

The principal issue here is whether, under the totality of the circumstances, defendant's custodial statements were freely and voluntarily given. Confessions obtained by the police during a custodial interrogation are barred from evidence unless the defendant has been advised of his or her constitutional rights. *Miranda, supra,* 384 *U.S.* at 444, 86 *S.Ct.* at 1612, 16 *L.Ed.*2d at 707. Stated differently, a defendant's custodial statement is admissible if it results from the "voluntar[y], knowing[ ] and intelligent[ ]" waiver of his or her constitutional right to remain silent. *Ibid.*

The Fifth Amendment of the United States Constitution provides that "[n]o person ... shall be compelled in any criminal case to be a witness against himself...." *U.S. Const.* amend. V. That provision is known as the privilege against self-incrimination and applies to the states through the Fourteenth Amendment. *Malloy v. Hogan*, 378 *U.S.* 1, 6, 84 *S.Ct.* 1489, 1492, 12 *L.Ed.*2d 653, 658 (1964). Although our New Jersey Constitution lacks a similar provision, "the privilege against self-incrimination derives from the common law and is codified in our statutes and rules." *State v. Cook*, 179 *N.J.* 533, 549, 847 *A.*2d 530 (2004). Our law regarding the privilege against self-incrimination is generally consistent with federal constitutional law. *State v. Burris*, 145 *N.J.* 509, 520, 679 *A.*2d 121 (1996). As we previously explained,

New Jersey law also distinguishes between the failure to issue the prophylactic safeguards of *Miranda* and the violation of the privilege against self-incrimination once those protective rights are asserted. *E.g., State v. McCloskey*, 90 *N.J.* 18, 27, 446 *A.*2d 1201 (1982) (holding that a failure to warn is merely a violation of *Miranda's* prophylactic-procedural safeguards; however, a failure to honor the

invoked right to remain silent is of constitutional dimension). New Jersey also recognizes that the right to counsel is one of the protective rights that surround the privilege against self-incrimination and must be included among the *Miranda* warnings. *State v. Kennedy,* 97 *N.J.* 278, 284, 478 *A.*2d 723, (1984); *see also State v. Reed,* 133 *N.J.* 237, 627 *A.*2d 630 (1993) (finding that under State privilege against self-incrimination, defendant had additional ancillary right to be informed of present availability of counsel based on presumed coercion inherent in custodial interrogation). Like the right to remain silent, once the right to counsel is invoked it assumes a constitutional status, and interrogation must cease; disregard of that claimed right violates the privilege itself. *Kennedy, supra,* 97 *N.J.* at 285, 478 *A.*2d 723.

[*Ibid.*]

In *Miranda,* the United States Supreme Court established the procedures the police must follow to comply with an accused's privilege against self-incrimination. *Supra,* 384 *U.S.* at 444, 86 *S.Ct.* at 1612, 16 *L.Ed.*2d at 706–07. The police must warn the suspect (1) of the right to remain silent; (2) that any statement made may be used against him or her; (3) that the person has a right to an attorney; and (4) that if the person cannot afford an attorney, one will be provided. *Ibid.*

Because the evidence clearly supported the finding of each trial court that defendant was consistently informed of his *Miranda* rights and waived them each time, we are not faced with the question of whether defendant was informed of his *Miranda* rights prior to questioning. The key question here is whether defendant's waiver of the privilege and resulting statements were made voluntarily, as due process requires. *See Dickerson v. United States,* 530 *U.S.* 428, 433–34, 444, 120 *S.Ct.* 2326, 2330, 2336, 147 *L.Ed.*2d 405, 413 (2000); *State v. P.Z.,* 152 *N.J.* 86, 113, 703 *A.*2d 901 (1997).

The State must prove beyond a reasonable doubt that a defendant's confession was voluntary and was not made because the defendant's will was overborne. *State v. Galloway,* 133 *N.J.* 631, 654, 628 *A.*2d 735 (1993). To determine whether a statement was made voluntarily,

[a] court must look at the totality of the circumstances, including both the characteristics of the defendant and the nature of the interrogation. Relevant factors to be considered include the suspect's age, education and intelligence,

advice concerning constitutional rights, length of detention, whether the questioning was repeated and prolonged in nature, and whether physical punishment and mental exhaustion were involved.

[*Ibid.* (citing *Schneckloth v. Bustamonte,* 412 *U.S.* 218, 226, 93 *S.Ct.* 2041, 2047–48, 36 *L.Ed.*2d 854, 862 (1973) and *State v. Miller,* 76 *N.J.* 392, 402, 388 *A.*2d 218 (1978)).]

In addition, we have considered other relevant factors, such as previous encounters with law enforcement, *State v. Presha,* 163 *N.J.* 304, 313, 748 *A.*2d 1108 (2000), and the period of time between "administration of the [*Miranda*] warnings and the volunteered statement[.]" *State v. Timmendequas,* 161 *N.J.* 515, 614, 737 *A.*2d 55 (1999), *cert. denied,* 534 *U.S.* 858, 122 *S.Ct.* 136, 151 *L.Ed.*2d 89 (2001). However, unlike physical abuse, "use of a psychologically-oriented technique . . . is not inherently coercive." *Galloway, supra,* 133 *N.J.* at 654, 628 *A.*2d 735.

### B.

The State argues that, under the totality of the circumstances, it has demonstrated beyond a reasonable doubt that defendant's will was not overborne and his statements were voluntary. *Cook, supra,* 179 *N.J.* 533, 847 *A.*2d 530, *Timmendequas, supra,* 161 *N.J.* 515, 737 *A.*2d 55, and *State v. Morton,* 155 *N.J.* 383, 715 *A.*2d 228 (1998), *cert. denied,* 532 *U.S.* 931, 121 *S.Ct.* 1380, 149 *L.Ed.*2d 306 (2001). Defendant, to the contrary, argues that even when a defendant has waived his or her rights, a subsequent incriminating statement may not be admissible at trial if the statement and the waiver were obtained as a result of improper police coercion. Defendant maintains that the Appellate Division was correct and relies on *Galloway, supra,* 133 *N.J.* 631, 628 *A.*2d 735, *State v. Roach,* 146 *N.J.* 208, 680 *A.*2d 634, *cert. denied,* 519 *U.S.* 1021, 117 *S.Ct.* 540, 136 *L.Ed.*2d 424 (1996), and *Reed, supra,* 133 *N.J.* 237, 627 *A.*2d 630, to support his position. We examine each of those authorities in order.

In *Cook,* we held that the defendant's statements were admissible under the totality of the circumstances. *Supra,* 179 *N.J.* at 563, 847 *A.*2d 530. There, on February 16, 1999, around 9:30 p.m., the defendant was arrested and advised of his *Miranda* rights.

*Id.* at 542, 847 *A.2d* 530. After he waived his rights, the interrogation began at about 9:50 p.m. and continued until 3:00 a.m. the next morning. *Id.* at 542–43, 847 *A.2d* 530. During that interview, the defendant was offered a beverage twice and a bathroom break. *Id.* at at 543, 847 *A.2d* 530. The defendant was then transported to a correctional facility and held on municipal warrants. *Id.* at 543–44, 847 *A.2d* 530. The next day, February 18, and before a second interrogation began at around 10:40 a.m., the defendant was again given his *Miranda* rights. *Id.* at 544, 847 *A.2d* 530. During that second interview, which lasted approximately two hours, the defendant gave conflicting stories, ultimately agreeing to take a polygraph test. *Ibid.* The third interrogation, which included the polygraph test, followed and concluded at about 3:30 p.m. *Ibid.* The fourth interrogation session began immediately thereafter and lasted until 8:00 p.m. *Id.* at 545, 847 *A.2d* 530. After the defendant was told he failed the polygraph test and after he continued to give different versions of what transpired the night of the victim's death, the defendant eventually confessed to the murder. *Id.* at 544–45, 847 *A.2d* 530. In rejecting the defendant's contention that his will was overborne because of the substantial psychological pressure, we noted that although the nine-hour interrogation on February 18 was long, it was conducted during a general workday, and the defendant was given breaks and food. *Id.* at 545–46, 847 *A.2d* 530. Moreover, we noted a lack of evidence that the defendant was unwilling to speak, deprived of sleep, or subject to physical or mental abuse, and that he was a twenty-four year old high school graduate who understood his rights. *Id.* at 547–48, 847 *A.2d* 530. Lastly, we found no evidence that promises were made to the defendant. *Ibid.*

In *Timmendequas,* the initial questioning began on the evening of June 29, 1994, shortly before midnight and lasted until 4:00 a.m., the following morning, when the defendant was permitted to go home. *Supra,* 161 *N.J.* at 617, 737 *A.2d* 55. After a few hours of sleep, the defendant returned to police headquarters and questioning resumed. *Ibid.* He was interrogated from 10:45 a.m. until

6:25 p.m., when he confessed and led the police to the location of the victim's body. *Ibid.* The defendant was then placed in a cell. *Ibid.* Questioning resumed the next day at around 3:00 p.m. *Ibid.* The defendant never indicated to the police that he was too tired or too hungry to continue, nor did his responses indicate otherwise. *Ibid.* In assessing the totality of the circumstances, we found "ample evidence indicating that defendant's confessions were the product of his own free will[,]" and that "there [was] no evidence that police used coercive tactics in obtaining any of the confessions." *Id.* at 617–18, 737 *A.*2d 55.

In *Morton*, after the defendant was arrested for a motor vehicle violation and taken to the prosecutor's office, the police questioned him about a murder from 11:40 a.m. to 9:01 p.m. *Supra*, 155 *N.J.* at 448, 715 *A.*2d 228. The defendant waived his rights. *Ibid.* After the first two hours, the interview was tape-recorded. *Ibid.* During the long interview period that followed, the defendant was administered several polygraph tests. *Ibid.* At around 7:45 p.m., the defendant said he had lied in his earlier statement and gave a second taped statement admitting he stabbed the victim. *Ibid.* The defendant was offered food and drink. *Id.* at 450, 715 *A.*2d 228. Later, the defendant sought to suppress his confessions because he "spent nine and one half hours at the police station" and because "his confessions were involuntary." *Ibid.* In affirming the trial court's conclusion that the State had proved that the defendant's confession was voluntary beyond a reasonable doubt, *id.* at 449, 715 *A.*2d 228, we noted that the police informed the "defendant of his rights on more than one occasion and offered him food and drink." *Id.* at 450, 715 *A.*2d 228. "[W]e decline[d] to hold [the] defendant's inculpatory statements involuntary based on the amount of time he spent in custody." *Ibid.*

In *Galloway*, the defendant was twenty-seven years old, had a tenth grade education, a G.E.D., and a "dull normal" I.Q. *Supra*, 133 *N.J.* at 656, 628 *A.*2d 735. When given the *Miranda* warnings on several occasions, the defendant acknowledged that he understood his rights. *Id.* at 639, 628 *A.*2d 735. The incident—the

shaking of a three-month old infant and the resulting death—had occurred around 11:40 p.m. and the defendant, who had not slept that night, was taken to headquarters around 5:40 a.m. the next day. *Id.* at 638–39, 628 *A.*2d 735. The statement was completed by 8:00 a.m., but the defendant did not admit he had shaken the baby. *Id.* at 639, 628 *A.*2d 735. The defendant agreed to speak to another investigator who advised him of his *Miranda* rights and encouraged him to tell the police what happened so the doctors could properly treat the baby. *Ibid.* Subsequently, the defendant acknowledged he lied and admitted to shaking the baby. *Ibid.* In finding that the defendant's confession was the product of a knowing, voluntary, and intelligent waiver of his *Miranda* rights, we considered the totality of the circumstances that included the defendant's age, education, intelligence range, prior experience with the police, and that he had received food and drink, seen his father, and did not appear to be tired despite not having slept the previous night. *Id.* at 656–57, 628 *A.*2d 735.

In *Roach,* the defendant argued that the police obtained his *Miranda* waiver and confession by deceiving him into believing that they sought his statement as a witness and not as a defendant. *Supra,* 146 *N.J.* at 226, 680 *A.*2d 634. We concluded that the defendant's statements were not extracted by "unfair means" and also noted that "defendant had extensive experience with the criminal justice system both as a juvenile and as an adult." *Id.* at 227, 680 *A.*2d 634.

In *Reed,* the defendant confessed to the murder of his co-worker after he notified the police that he found her body, was taken in for questioning as a witness, and waived his *Miranda* rights three times. *Supra,* 133 *N.J.* at 240–45, 627 *A.*2d 630. During questioning, but before the defendant made any incriminating statements to the police, the defendant's girlfriend obtained a lawyer for the defendant. *Id.* at 241, 627 *A.*2d 630. She asked the police officer to tell the defendant that a lawyer was on the way, but the officer neglected to do so. *Ibid.* Considering the defendant to be a suspect and no longer just a witness, the police relocated him to

another building. *Id.* at 241–42, 627 *A.2d* 630. Rather than have the defendant walk by his girlfriend, who was sitting next to an elevator, the police led the defendant down four flights of stairs and out a back door. *Id.* at 241, 627 *A.2d* 630. When the lawyer arrived shortly thereafter, the prosecutor declined his request to speak with the defendant, claiming that the defendant was only a witness and that the lawyer did not have the right to walk in on an investigation. *Id.* at 242–43, 627 *A.2d* 630. In addressing whether law-enforcement officers in conducting custodial interrogations of a suspect must inform the suspect that an attorney retained on his or her behalf is present and seeks to provide assistance, we found that the failure of the police to inform the suspect that his attorney was present and asking to speak with him violated the defendant's privilege against self-incrimination, rendering the confession inadmissible. *Id.* at 253–261, 627 *A.2d* 630. We reasoned that, "a waiver of the right against self-incrimination which, by all subjective indicia, appears knowing, intelligent, and voluntary, may still be deemed invalid when elicited in an atmosphere of coercion." *Id.* at 256, 627 *A.2d* 630.

## C.

■ Against that legal landscape, we analyze the facts before us. Defendant has a high school diploma and attended college for at least one year. On the day of the incident, he was informed of his *Miranda* rights on several occasions. Because he had two prior convictions, defendant was familiar with the criminal justice system. At no time did defendant request an attorney and, despite defendant's allegations, the trial court found that the police made no promises or threats to obtain his statements. Even though defendant was not fully clothed and wore only a hospital gown and socks, he was responsible for the removal of his clothes at the scene, not the police.[2] During the first, homicide-related interro-

---

[2] Further, defendant's discarded clothing was evidence that the State would likely use at trial.

gation, he was given a soda, a bag of potato chips, and an opportunity to use the restroom. Although he did not recall the last time he ate or slept prior to his arrest, defendant did not testify he was too tired to be interviewed.

We accept the trial court's findings and conclude that defendant's claims that he was not permitted to telephone his grandfather and that he was forced to urinate in a soda can were unfounded. Defendant asserted that he confessed to the crimes out of fear because in April 2000 the police had questioned him about the murder of his friend and, as a result, he felt threatened. However, defendant does not claim he was in fact threatened by the police at any time during the lengthy interview on this occasion. Consequently, "[defendant's] subjective fear did not derive from a threat amounting to coercion under the Fifth Amendment." *P.Z., supra,* 152 *N.J.* at 115, 703 *A.*2d 901.

Applying the totality of the circumstances test, there was sufficient credible evidence for the trial court to conclude that defendant's statement confessing to the homicide was constitutionally obtained. The police had no reason to believe that defendant would be "particularly vulnerable to interrogation." *Galloway, supra,* 133 *N.J.* at 656, 628 *A.*2d 735. Further, we find nothing in the facts here that rises to the level of "unfair means" that were present in *Reed, supra.* Indeed, defendant acknowledged that during that questioning, Detective Gregory was fair to him. Thus, there was ample evidence for the trial court to find that "defendant's fear of police, if it existed, was not occasioned by any threats or action taken against him."

Even though the record is not precise regarding the time the interrogation was initiated in the investigation room, the evidence was clear that it occurred during daylight hours and concluded at about 3:20 p.m. Thus, the entirety of the interrogation took place within, what might be termed, a daytime work shift. In *Morton,* we rejected the defendant's argument that his confessions were involuntary because he spent nine and one-half hours at the police station, and we cited numerous out-of-state decisions in support of

that conclusion. *Supra*, 155 *N.J.* at 450, 715 *A.*2d 228 (citing *State v. James*, 237 *Conn.* 390, 678 *A.*2d 1338, 1357 (1996) (holding fourteen-hour interrogation yielded voluntary confession); *People v. Bounds*, 171 *Ill.*2d 1, 215 *Ill.Dec.* 28, 662 *N.E.*2d 1168, 1180–81 (1995) (holding eight-hour interrogation yielded voluntary confession), *cert. denied*, 519 *U.S.* 876, 117 *S.Ct.* 197, 136 *L.Ed.*2d 133 (1996); *People v. Sobchik*, 228 *A.D.*2d 800, 644 *N.Y.S.*2d 370, 372 (1996) (holding nine-hour interrogation during which defendant was connected to polygraph machine yielded voluntary confession); *Higgins v. State*, 889 *P.*2d 964, 967 (Wyo.1995) (holding seven and one-half hours of interrogation within eleven-hour period yielded voluntary confession)). *See also United States v. Haswood*, 350 *F.*3d 1024, 1028 (9th Cir.2003) ("all day" interrogation yielded voluntary confession; "coercion typically involves far more outrageous conduct"); *United States ex. rel v. Daniel Wilkins*, 292 *F.*2d 348, 349–50 (2d Cir.1961) (holding eighteen hours of interrogation within twenty-four hour period yielded voluntary confession), *cert. denied*, 372 *U.S.* 917, 83 *S.Ct.* 731, 9 *L.Ed.*2d 723 (1963); *State v. Doody*, 187 *Ariz.* 363, 930 *P.*2d 440, 446 (Ct.App.) (holding thirteen-hour overnight interrogation yielded voluntary confession), *cert. denied*, 520 *U.S.* 1275, 117 *S.Ct.* 2456, 138 *L.Ed.*2d 213 (1997); *People v. Towndrow*, 236 *A.D.*2d 821, 654 *N.Y.S.*2d 69 (holding fourteen-hour interrogation yielded voluntary confession), *appeal denied*, 89 *N.Y.*2d 1016, 658 *N.Y.S.*2d 254, 680 *N.E.*2d 628 (1997). To be sure, the length of the interrogation is a critical factor, but it is only one of the many factors that must be evaluated in applying the totality of the circumstances test. *See Cook, supra*, 179 *N.J.* at 563–64, 847 *A.*2d 530. Under these circumstances, where the entirety of the interrogation occurred within the daytime hours and concluded by 3:20 in the afternoon, the length of the interrogation alone is insufficient reason to invalidate defendant's confession.

In short, we find there was sufficient credible evidence for the trial court to find that the State proved beyond a reasonable doubt that defendant voluntarily waived his right against self-incrimination and freely gave his murder-related statement to the police.

We conclude that the lengthy interrogation during the daytime hours that led to defendant's statement resulted from defendant's knowing, voluntary, and intelligent waiver of his rights against self-incrimination and was the product of his free will, and not coercive. Thus, the trial court properly denied defendant's motion to suppress his statement concerning the murder of the taxi driver.

## IV.

■ Defendant's appellate challenge to, and the Appellate Division's rejection of, the admissibility of defendant's robbery-related confessions also must be addressed. As a jurisdictional matter, the State argues that by entering an unconditional guilty plea, defendant waived his right to challenge the admissibility of his robbery confessions. We agree.

As noted above, after the denial of his motion to suppress his confessions to the robberies, defendant withdrew his not guilty plea and entered into a plea agreement with the State. That plea was without any conditions.

■ "Generally, a defendant who pleads guilty is prohibited from raising, on appeal, the contention that the State violated his constitutional rights prior to the plea." *State v. Crawley*, 149 *N.J.* 310, 316, 693 *A.*2d 859 (1997); *see also Tollett v. Henderson*, 411 *U.S.* 258, 267, 93 *S.Ct.* 1602, 1608, 36 *L.Ed.*2d 235, 243 (1973) ("When a criminal defendant has solemnly admitted in open court that he is in fact guilty of the offense with which he is charged, he may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea."). Included within those constitutional rights that are deemed waived after entering an unconditional guilty plea are "the privilege against compulsory self-incrimination, the right to trial by jury, the right to confront one's accusers, and the right to a speedy trial." *Crawley, supra,* 149 *N.J.* at 316, 693 *A.*2d 859.

Our rules provide for three exceptions to the general rule of waiver. First, *Rule* 3:5–7(d) and *Rule* 7:5–2(c)(2) permit a defendant to appeal the denial of a Fourth Amendment-based motion to suppress evidence after a conviction whether based on a guilty plea or a conviction. *State v. Greeley,* 178 *N.J.* 38, 50, 834 *A.*2d 1016 (2003). "As explained by the Appellate Division ..., only motions for suppression *on the grounds of unlawful search and seizure* automatically survive the entry of a guilty plea." *Id.* at 50–51, 834 *A.*2d 1016 (citing *State v. Robinson,* 224 *N.J.Super.* 495, 500–01, 540 *A.*2d 1313 (1988), and Pressler, *Current N.J. Court Rules,* comment 5 on *R.* 3:5–7 (2004)) (emphasis in the original); *compare State v. Smith,* 307 *N.J.Super.* 1, 8, 704 *A.*2d 73 (App.Div. 1997) (noting that " 'unsuccessful challenges to statements and *Miranda* violations cannot be raised on appeal after a guilty plea pursuant to *R.* 3:5–7(d)' ") (citation omitted), *certif. denied,* 153 *N.J.* 216, 708 *A.*2d 67 (1998). Thus, the first exception does not apply because this case does not concern a motion for suppression of physical evidence on the grounds of unlawful search or seizure, but rather a motion to suppress a statement.

Second, *Rule* 3:28(g), permits a defendant to appeal the denial of admission into a pretrial intervention program. That is plainly not present here.

Third, and pertinent here, *Rule* 3:9–3(f), expressly authorizes a defendant to "enter a conditional plea of guilty reserving on the record the right to appeal from the adverse determination of any specified pretrial motion." In the event a defendant prevails on appeal, he or she "shall be afforded the opportunity to withdraw his or her plea." *Ibid.* Here, defendant's plea was unconditional and he did not preserve the issue of the admissibility of his statements under *Rule* 3:9–3(f). Moreover, at the plea hearing, defendant acknowledged that his statements admitting to the robberies were true. In short, we conclude that, because defendant entered an unconditional guilty plea, he waived his right to contest the admissibility of his statements concerning the robberies.

## V.

The judgment of the Appellate Division is reversed. The matter is remanded to the Appellate Division to consider defendant's arguments not addressed in this decision.

*For reversal and remandment*—Chief Justice PORITZ and Justices LONG, LaVECCHIA, ZAZZALI, ALBIN, WALLACE and RIVERA–SOTO—7.

*Opposed*—None.