**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4925-15T1

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

FELIX N. GRAVES-DARDON,

     Defendant-Appellant.

_____

Argued November 28, 2018 – Decided August 30, 2019

Before Judges Nugent and Mawla.

On appeal from the Superior Court of New Jersey, Law Division, Somerset County, Indictment No. 12-09-0677.

Alyssa A. Aiello, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Alyssa A. Aiello, of counsel and on the brief).

Jennifer E. Kmieciak, Deputy Attorney General, argued the cause for respondent (Gurbir S. Grewal, Attorney General, attorney; Jennifer E. Kmieciak, of counsel and on the brief).

PER CURIAM

Defendant, Felix N. Graves-Darden, was indicted for the first-degree purposeful or knowing murder of Yadira Blaimayer, N.J.S.A. 2C:11-3(a)(1) or -3(a)(2), and third-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(d). After a jury convicted defendant of both offenses, the trial court sentenced him to life imprisonment subject to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2, on the murder conviction and merged the weapons conviction.

Defendant appeals and argues the following points:

POINT I

THE TRIAL COURT ERRED IN DENYING SUPPRESSION OF DEFENDANT'S STATEMENT, BECAUSE THE STATE FAILED TO PROVE BEYOND A REASONABLE DOUBT THAT DEFENDANT'S WAIVER OF RIGHTS WAS KNOWING, INTELLIGENT AND VOLUNTARY.

A. Introductory Remarks Made By The Detective Were Misleading And Operated To Neutralize The Miranda Warnings That Were Read To Defendant Immediately Thereafter.

B. Defendant's Waiver Of His Miranda Rights Was Rendered Invalid By The Improper Manner In Which The

2

Detective Responded to Defendant's Questions Regarding His Right To Counsel And Status As A Suspect.

i. Defendant's Waiver Of Rights Was Not Knowing And Intelligent Because The Detective Provided Him With An Incorrect Explanation Of The Right To Counsel.

ii. Under The Totality Of The Circumstances, The Detective's Misleading Response To Defendant's Question Regarding The Nature of The Investigation And His Status As A Suspect Rendered Invalid Defendant's Subsequent Waiver.

C. Conclusion.

POINT II

THE JUDGE'S REFUSAL TO CHARGE THE JURY ON SELF-DEFENSE REQUIRES REVERSAL, BECAUSE DEFENDANT'S STATEMENT PROVIDED A RATIONAL BASIS FOR SUCH A CHARGE.

POINT III

THE JUDGE'S REFUSAL TO CHARGE THE JURY ON PASSION/PROVOCATION MANSLAUGHTER DEPRIVED DEFENDANT OF A FAIR TRIAL AND DUE PROCESS OF

3

LAW, AND REQUIRES REVERSAL OF HIS MURDER CONVICTION.

POINT IV

THE MATTER MUST BE REMANDED FOR RESENTENCING BECAUSE THE SENTENCING JUDGE, IN IMPOSING THE MAXIMUM SENTENCE OF LIFE IN PRISON ON A DEFENDANT WHO HAD NEVER BEEN ARRESTED BEFORE INCORRECTLY FOUND AGGRAVATING FACTOR (2), AND DID NOT PROPERLY CONSIDER DEFENDANT'S INTOXICATION AT THE TIME OF THE OFFENSE.

Because the trial court denied defendant's request to instruct the jury on self-defense and passion-provocation manslaughter, and because there was evidence in the record to support those charges, we reverse and remand for a new trial.

I.

The State presented the following evidence at trial. Defendant lived in the rear first-floor bedroom he subleased from the family who leased the first floor of a house on Prospect Place in North Plainfield. The family slept in the front bedroom. The owner and his family lived on the second floor.

On August 11, 2012, between 11:00 and 11:30 p.m., the family that lived on the first floor returned home to find defendant in the kitchen, naked and

4

intoxicated, mopping up blood.  After the mother saw bloodstains on the kitchen curtains and floor, on defendant's clothes, and in the bathroom, and a woman's sandal and lip-gloss on the bed in defendant's bedroom, another family member telephoned her brother-in-law, who came to the house with his son.  The brother-in-law called the police and the son interpreted for them, as defendant and the other residents spoke only Spanish.

North Plainfield Police Officers Richard Dow and Joseph Mazza arrived separately shortly before 12:30 a.m.  After speaking with the brother-in-law and his son and seeing the "large amount of blood throughout the kitchen[,]" the officers, accompanied by the son, went to the basement.  The officers observed blood on the steps leading to the basement, and "a lot of bed sheets, pillows covered in blood at the base of the stairs[.]"  They found defendant, asleep and naked, under a blanket or comforter, on the floor in front of the washer and dryer.

The officers woke defendant and asked if he was hurt.  They noticed he had some minor facial injuries but nothing substantial.  Defendant told the officers he had been drinking at the house and later downtown.  His brother had asked to borrow the keys to the house so he could bring his girlfriend back.  Defendant claimed his brother had been in a fight at a bar called Pueblo Viejo,

the blood had come from his brother, and his brother might be in his room.

Officer Mazza went upstairs to investigate. No one was in defendants' bedroom, but the officer observed large pools of blood on the floor, couch, and clothing on the couch. He also saw a woman's purse on the bed. Officer Dow brought defendant upstairs, where the officers asked him what happened and where his brother was. At that point, defendant became belligerent and incoherent.

Officer Mazza went outside to the backyard. He noticed the porch railing was broken and appeared to have blood on it. In an alleyway between the house and a neighboring house, he found a woman lying in the grass, unconscious. Her pants were pulled down, her bra was pulled up, she had lacerations on her neck and right arm, and she was covered in blood. Detectives and crime scene investigators were notified.

Meanwhile, Officer Charles Halsted had arrived. Testifying at trial, the officer described defendant's appearance:

> He had on a dirty white T-shirt, jeans, no shoes on.
>
> . . . [H]e had what appeared to be dry blood on his feet and hands and he had scratches on his face, neck.
>
> . . . .

A-4925-15T1

[H]is eyes were red, bloodshot. When I got near him I could smell the odor of an alcoholic beverage.

Officer Halsted transported defendant to headquarters at approximately 1:00 a.m. Defendant was not handcuffed, but he needed assistance walking to the car because he was unstable on his feet. Once at headquarters, unprompted, defendant said he had been at two bars earlier and had too many beers and had later been robbed on Front Street in Plainfield. He did not report the robbery to police. Defendant was placed in a holding room where he slept for more than three hours.

North Plainfield Detective Eugene Segeda woke defendant and asked if he would be willing to speak with police. Defendant was tired and disoriented, but that lasted "[j]ust a couple of moments." Defendant declined medical attention and "seemed like he [had] sobered up." Officer Halsted and Detective Segeda escorted defendant to an interview room; defendant did not need assistance walking.

Detective Segeda and Detective Sergeant Werner Rodas of the Somerset County Prosecutor's Office interviewed defendant. Sergeant Rodas was the lead interviewer, as he spoke fluent Spanish. The interview, which lasted approximately three hours, was videotaped and later transcribed into English. Jurors were given transcripts to follow while the tape played at trial.

A-4925-15T1

Before questioning defendant about what happened at the house, the officers introduced themselves and read defendant his Miranda[1] rights. During the introduction, and before informing defendant of his Miranda rights, the following exchange occurred between Sergeant Rodas and defendant:

> SR: Felix, how are you?
>
> FG: There.
>
> SR: There what?
>
>   . . . .
>
> SR: Are you sleepy?
>
> FG: Sleepy and anguish.
>
> SR: Ok. Um, I'm Sergeant Rodas. I work for the Prosecutor, County of Somerset. This is Detective Segeda, he works here in North Plainfield. [W]e need to talk with you in reference to an investigation we're conducting – at your house, . . . , you live at . . . Prospect Place, right?
>
> FG: Yes, Prospect.
>
> SR: Ok? And I said, we want to talk with you and we want to see your, your part of the story that, that, that happened tonight. But before I talk with you, I need to offer you your rights or advise you of your rights, Ok? But, uh, everyone has their story, their part they have to talk about, Ok? Um, can you read Spanish?

---

[1] Miranda v. Arizona, 384 U.S. 436 (1966).

A-4925-15T1

FG: Yes.

Following a discussion about defendant's home country, the Sergeant continued:

> SR: . . . Ok. Can you read Spanish? Ok. So, what we're going to do is, I'm going to read it and you follow along with me – If you don't understand for any reason, tell me and I'll explain it to you. Ok? This form is called the "Miranda Advisement," and this is from Somerset County, the Somerset County Prosecutor's Office, Ok? These are your rights and I'm going to read you your rights. I'm going to try to do it slowly so you understand, Ok? Rights. The first right is that you have the right to remain silent.
>
> Do you understand that right? If you understand, what I need you to do, uh, put your initials over here and mark "yes" here. Ok?
>
> FG: The, the "G?"
>
> SR: What are your initials?
>
> FG: "FG."
>
> SR: "FG?"
>
> FG: Uh-huh.
>
> SR: Yes, that. Ok. Second: Everything you say can be used against you in a court of law. Do you understand this?
>
> FG: Yes.

A-4925-15T1

SR: Ok. The same here, please. You have the right to speak with an attorney at any time and to have him at your disposal before, during, or after questioning. Do you understand that right?

FG: Yes.

SR: Ok. Here, the same here, please. Ok. In case you can hire an attorney . . . that you cannot hire an attorney, but you want one, one will be appointed to you at no cost before any questioning. Do you understand this right?

FG: But how . . . I mean, what do you mean?

SR: That is if you would want an attorney, if you would like to hire one, it could be that, uh, if you make an application, it is possible that you obtain one for free also, if you want.

FG: Ok. But, but what am I being accused of?

SR: Well, uh, I, I want to talk with you about everything. No one is accusing you, I'm not accusing you of anything. We're investigating the case. The thing is that that before asking you questions, I have to inform you of your rights. That's why I always want to offer you this first before asking you any questions because, uh, these are the rights you have. Ok? Do you understand the right?

FG: Yes.

SR: Ok. Your decision to waive these rights and answer the questions will not be final. You will have the right to stop answering questions and speak with an attorney at any time during the questioning. Do you understand this right?

A-4925-15T1

FG: Yes.

SR: Ok.  The same here, please.  Ok, this part, bottom part is called the waiver.  Here it says that "I acknowledge having been informed about my rights that have been indicated before.  I understand said rights and I agree to speak with the police."  Can you, uh, talk with me?  Sign there and write your name over here.

DS: I've got 4:51 a.m.

SR: Ok.  Thanks.  Sign there.  Ok, sir, Felix, um, you live at . . . Prospect Place, right?  Who do you live with there?

As recorded on video, Sergeant Rodas read defendant his Miranda rights from the "Miranda Advisement" form, which defendant initialed and signed.

According to defendant's recorded interview, he arrived home around 2:00 p.m. and helped the dwelling's owner and "two other guys" with some work. While working, the men drank beer.  Between 7:00 and 7:30 p.m., defendant left to go to a bar called Pueblo Viejo.  On his way, he ran into a man known as "Chino," with whom he had problems in the past, who was with two other men. Two of the men hit defendant, he swung back, and the three men ran away.

After the altercation, on his way home, defendant ran into a friend.  The two went to a bar behind the police station, where defendant saw his brother. After leaving the bar, defendant had his friend drop him off at a store to buy

11

cigarettes. There, he saw the three men from before. Defendant said when he was almost home someone grabbed him and he "felt the lights go out."

Continuing his statement, defendant claimed the next thing he remembered was the police waking him in the basement while he was naked and wrapped in a sheet. He said he had "maybe more than twenty beers" that night, and the blood on his body came from the fight with the men on the street.

Sergeant Rodas asked defendant whether he met a girl that evening, and defendant said he was with two girls who both worked at the bar, but they stayed at the bar when he left. Defendant repeatedly asserted he did not remember anything after getting home and did not remember cleaning up blood.

As the interview continued, defendant said he remembered getting a call from a woman whose name he did not know, who said she would "come by." He could not remember anything after that.

Defendant asked the officers if they had found any money, because he remembered having five hundred dollars in his pants pocket. Sergeant Rodas asked if the woman tried to steal his money, and defendant replied "Maybe. . . . That's why I'm . . . asking you, because I had five hundred dollars." When Sergeant Rodas suggested he may have been provoked, defendant said "Yes, but not so, not so that I would do something evil to her." Defendant suggested a

mistake may have occurred and something provoked him, but he did not understand it and could not remember.

Defendant explained he remembered going to the bathroom to bathe and leaving his five hundred dollars on the dresser. When he came out, there was a woman there, but he could not remember what she looked like or was wearing. His five hundred dollars was no longer on the dresser, and the woman asked him to pay her, but he said "[h]ow am I going to pay you?" The woman said she was leaving because he was not going to pay her, and he thought she had taken his money so he asked, "why are you stealing it from me?" She replied she was leaving. Defendant denied getting angry at this point, but said he could not remember anything else.

Defendant later remembered the woman thought he was going to hurt her, and there was a knife in the kitchen that the woman took. He claimed the woman "attacked [him] with the knife" and scratched him with her nails. He recalled they scuffled in the kitchen, and the fight spilled over into the bedroom, where the woman tripped on the bed, slipped backwards while they were both holding the knife, and was stabbed in the neck. This is the exchange between defendant and the Sergeant:

> D:     Ughh! . . . [Exhales] Uh, there was a knife in the kitchen.

A-4925-15T1

SR:   Uh-hum.

D:   Yes, she thought that, that I was going to . . . that I was going to hurt her.

SR:   Uh-hum.

D:   And she took the knife, and, because – when I asked her why, why, why was she leaving?  Because, my money.  And, no, that there was not going to be anything in exchange, that she had to give me my money back, I told her that.

SR:   Uh-hum.

D:   Yes, she took it.

SR:   The knife?

D:   Yes.

SR:   What happened after that?

D:   She took the knife.

SR:   What happened after she took the knife?

D:   Yes, she took the knife… [Sighs] she took the knife and, and, and she attacked me with the knife.

SR:   And then what happened?

D:   [Sighs] At the end… [Sighs]

SR:   Then what happened?

D:   She got all over me with the knife and – and –

A-4925-15T1

when she got all over me, that was when, when she did this to me. Yes, she did this to me like that and, and she stuck her nails in me here.

SR:   Uh-hum.

D:   Yes, she stuck her nails in me.

SR:   Then what happened?

D:   Then we scuffled.

SR:   And what?

D:   We scuffled.

SR:   What is that?

D:   I mean…we fought/wrestled.

SR:   Oh, fight/wrestle, Ok. [2:26:52]

D:   Yes, because – uh – she got all over me with the knife and, and, and I moved to the side, and then she was following me. And then it was when, when we went back to the bedroom.

SR:   Uh-hum.

D:   And she with the knife.

    . . . .

D:   [S]he took the knife and got all over me. Ughh! [Exhales] Oh, how come [?----]!

SR:   And you fou-/wrest-, and you guys started fighting/wrestling, right?

   A-4925-15T1

D:     Yes.

SR:    For the knife?

D:     Yes, because she, she, she – she wanted to stick it into me.

SR:    Ok.  And did you fight with her and took the knife from her?

D:     No.

SR:    What happened with the knife, then?

D:     [Sighs] We did scuffle.

SR:    Uh-hum.  [2:28:32]

D:     Yes.  She, she tripped on the bed.

SR:    Uh-hum.

D:     And she hit the dresser.

SR:    How come she hit it?

D:     Uh, when, when we were scuffling –

SR:    Uh-huh.

D:     . . . she . . . in the, when I was in the bed – because she was walking backwards and she went like this.  She hit it like this and she fell on top of the dresser.

SR:    Uh-hum.

D:     And we were both holding the knife like this.

A-4925-15T1

SR:    Uh-hum.  [2:29:05]

D:    Oh, God.  Ughh! [Sighs] Oh…blessed God.

SR:    What happened?

D:    Yes, I remember now.

SR:    What happened?

D:    That was when it went in her here.

SR:    It went in her neck?  How?

D:    When I, I – uh, when she, she slipped and she went backwards –

SR:    Uh-hum.

D:    Oh! We both had the knife like this.

SR:    Uh-hum.  [2:29:36]

D:    Because I held her hand so she would stop. Because if I had not held her hand, she would have, she would have stuck it in me.

SR:    Uh-hum.

D:    And without my saying anything to her.  I was only asking her for my five hundred dollars. . . .

SR:    Uh-hum.

D:    Yes, then when she slipped, we were both holding the knife, and that's when she got stabbed here.

A-4925-15T1

Defendant ended the interview by stating, "Don't ask me for anything else, please."

After the interview ended, officers transported defendant to the hospital to collect evidence and document his injuries. Dr. Patricia Cataruozolo examined defendant and took photographs of his body, collected possible blood samples, and collected defendant's DNA using a buccal swab. Dr. Cataruozolo noted defendant sustained a swollen and lacerated bottom lip, two scratches on his left cheek, lacerations above his left eyebrow, scratches on his right cheek bone and nose, lacerations on his forehead, an abrasion on his upper right arm, scratches on his chest, a large scratch across his abdomen, scratches to his pubis and thighs, and an abrasion and scratches on his left shin.

The crime scene revealed a large number of bloodstained areas. Beginning in the basement, the crime scene technicians documented "footwear impressions and footprints in blood," as well as "bloody clothing, bloody bedding, a lock of hair, blood on the floor near a washing machine, and blood on the washing machine as well." However, the amount of blood was not consistent with the woman's injuries, and therefore the basement was determined not to be the location of the altercation.

Upstairs in the kitchen, investigators discovered blood on the floor, the curtains, the door leading to the backyard, the counter, the microwave, the clock, and the rear wall. In the bathroom, investigators found blood on the door, the floor, and in the sink, and a pair of green pants on the floor with blood spatter on them. In the pants, police later found a broken steak knife, a cellphone, and a passport with defendant's name on it.

Investigators concluded the back bedroom was where the altercation occurred, based on the amount of blood and signs of struggle. In the bedroom, they found bloodstains on the door, the floor, the bedding, and the couch. They found a bloody footprint that matched defendant's right footprint, a pair of blue shorts with a cellphone in the pocket, a woman's purse on the bed, and another cellphone between the bed and the wall. Inside the purse, investigators found a prescription pill bottle with the name of the victim, Yadira Blaimayer. The cell phone found between the bed and the wall was identified as belonging to the victim.

Many of the blood samples collected were tested for DNA. The victim's DNA matched swabbings from the green pants, the curtain panel, and the quilt. Neither defendant nor the victim could be excluded as partial contributors to mixed DNA profiles identified in a swabbing taken from the inside waistband

of the green pants. A mixed DNA profile found on the knife blade matched defendant as the major profile and the victim as the minor profile. The blood on defendant's feet contained a mixed DNA profile with the victim as the major contributor and defendant as the minor contributor. Clippings of the victim's fingernails could not include or exclude defendant as a partial contributor to at least two male contributors found.

Dr. Abraham Philip, who performed the autopsy, testified the cause of the victim's death was "multiple sharp and blunt force injuries to the body, and the manner of death was homicide." The doctor noted the victim was five feet two inches tall and weighed around 148 pounds. She sustained petechial hemorrhages within the eyelids from lack of oxygen, due to attempted strangulation; bruising on her forehead with bleeding into the subcutaneous layers of the skin, which indicated blunt force trauma; some cutting wounds on the left side of her face; a T-shaped wound on the left side of her jaw line; and a "big gaping wound across the front of the neck[.]" This last wound cut through the jugular vein and was the fatal wound.

The victim also had scratches on the right side of her neck consistent with fingernail marks, bruising and scratching on the neck that suggested attempted strangulation, a seven-inch wound on her abdomen, injuries around her left

20

breast, and a long wound on her upper right arm from her shoulder joint almost to the lower third of the upper arm, which was consistent with being cut by a serrated knife. The victim had defensive wounds on her forearm, one of her hands, one of her wrists, and some of her fingers.

Police obtained the records of the cellphones found at the scene but found no calls between defendant and the victim that night. However, the victim had contacted a man who lived in North Plainfield. He told police she was at his home between 8:00 and 10:00 p.m. on August 11, 2012, but he did not see her again after she left. The man testified he did not know how she got to his house that night, and he denied driving her anywhere.

Two of defendant's brothers were called to testify by the State. The first testified he spoke with defendant by phone during the evening of August 11, 2012, and had plans to meet with him the next day. After speaking with defendant, he did not leave the house. He did not have any fights and he was never in defendant's bedroom. Defendant's other brother testified he had no contact with defendant from August 10 through August 12, 2012.

Defendant did not testify but presented five witnesses in his defense: his sister, a brother, a detective, a neighbor, and an expert. His sister went to his apartment the day after the homicide. She found no money in defendant's

21

bedroom. His brother – who had testified in the State's case – and Detective Segeda watched a surveillance videotape from the Tequila Club and identified a man who entered the bar with defendant. The man who entered the bar with defendant was not the person defendant had mentioned in his interview with police.

The neighbor testified on the evening of August 11, 2012, he left his home, "probably" between 11:00 and 11:30 p.m., and saw "two to three people, two probably," drinking in the back of the house where defendant lived. The two men were drinking and talking. He did not see a woman. He could not identify either man, as he only glanced at them. Less than an hour later, when he returned, the police had already arrived.

Dr. Martin Weinapple, a forensic psychiatrist, testified defendant was in a "dissociative state" at the time of the killing due to acute alcohol intoxication. Based on defendant's level of intoxication, Dr. Weinapple opined defendant "lacked the cognitive ability to formulate any intent. . . . [H]e didn't act knowingly and purposely because of a cognitive impairment secondary to alcohol intoxication."

In rebuttal, the State presented the testimony of Dr. Howard Gilman, a forensic psychiatrist. Dr. Gilman agreed defendant was intoxicated at the time

of the crime, but disagreed it resulted in a "dissociative state." Dr. Gilman opined defendant's intoxication "did not impair his ability to act with purpose or knowledge at the time" of the crime.

During the charge conference, defense counsel requested the jury be charged on self-defense and passion/provocation manslaughter, requests the court denied. The judge noted defendant had not notified the State of his intention to assert a claim of self-defense, and the State had already rested.

The court charged the jury on intoxication as a defense to knowing or purposeful murder, and on aggravated manslaughter and reckless manslaughter as lesser-included offenses. On the second day of deliberations, the jury sent a note asking the court to "clarify the difference" between murder and aggravated manslaughter, so the judge reread the elements of each offense. The jury returned its verdict during the third day of deliberations.

## II.

### A.

Defendant first argues that contrary to the trial court's decision, the State did not prove beyond a reasonable doubt that the waiver of his Miranda rights was knowing, intelligent, and voluntary. He contends Sergeant Rodas made a series of inappropriate remarks that rendered the Miranda warnings ineffective.

Defendant argues the first inappropriate remark occurred when, during his introductory remarks, Sergeant Rodas said, "we want to see your – your part of the story that happened tonight. But before I talk with you I need to offer your rights or advise you of your rights, [o]kay? But, uh, everyone has their story, their part they have to talk about[.]" Defendant contends Sergeant Rodas undermined the <u>Miranda</u> warnings and suggested they were a mere informality in two ways: first, by telling defendant they wanted his part of the story; second, by saying immediately after telling defendant he would be read his rights that "everyone has their story [and] their part they have to talk about."

Next, according to defendant, Sergeant Rodas exacerbated his initial impropriety by giving misleading responses when defendant asked about his right to counsel and his status as a suspect. After Sergeant Rodas advised defendant of his right to counsel, and that counsel would be appointed if defendant could not afford an attorney, defendant asked, "But how . . . I mean what do you mean?" Sergeant Rodas responded that if defendant wanted an attorney and wanted to hire one, "it could be that[.]" The detective continued, "if you make an application it is possible that you obtain one for free also, if you want."

When defendant asked what he was being accused of, Sergeant Rodas responded,

> . . . I want to talk with you about everything. No one is accusing you. I am not accusing you of anything. We are investigating the case. The thing is that . . . before asking you questions, I have to inform you of your rights. That's why I always want to offer you this first before asking you any questions because, uh, these are the rights you have. Ok? Do you understand the right?

Defendant responded that he understood.

Defendant argues that it was obvious from his question about counsel that he did not have a full understanding of his right to an attorney. Defendant also argues that he was deprived "of information indispensable to a knowing and intelligent waiver when, in response to [his] question [about] . . . what [he was] being accused of . . . , the detective failed to inform [him] of the nature of the investigation or that defendant was the chief suspect."

Defendant asserts that under the totality of the circumstances, the State failed to prove beyond a reasonable doubt that he voluntarily, knowingly, and intelligently waived his <u>Miranda</u> rights.

The State responds that the trial court's determination the State proved beyond a reasonable doubt defendant's waiver of his <u>Miranda</u> rights was knowing, intelligent, and voluntary was amply supported by the record. The

A-4925-15T1

State insists nothing the detective said was inconsistent with the <u>Miranda</u> warnings. The State also points out that defendant eventually decided to invoke his right to remain silent, thus evidencing his understanding of his rights.

B.

The five officers who testified at the suppression hearing – Mazza, Dow, Halstead, Segeda, and Rodas – testified to substantially the same facts that they recounted at trial, as previously summarized. In addition, the State presented the video of defendant's confession, which the court reviewed, and documentary evidence, including the waiver of rights form. Defendant offered no evidence at the suppression hearing. Based on the State's evidence, the court concluded defendant knowingly, intelligently, and voluntarily waived his <u>Miranda</u> rights.

The court first determined that even if defendant was intoxicated upon arriving at police headquarters, he slept for three hours, and he did not appear to be intoxicated when he was interviewed. To the contrary, his demeanor, his manner of walking, his interaction with the detectives who interviewed him, his steady hand when initialing documents, and his apparent alertness all suggested he comprehended and responded appropriately to the officers' questions. Defendant does not challenge these findings on appeal.

26

The court next determined that Sergeant Rodas adequately answered defendant's question about how obtaining counsel happens. Addressing defendant's argument the detectives misinformed him about whether he was being accused of anything, the court noted that sometimes police lie to defendants during their investigation. Based on the court's review of the video and transcript of the interview, however, the court found the Sergeant conveyed to defendant his right to remain silent and his other <u>Miranda</u> rights; and defendant understood them. Under the totality of the circumstances, the detective's statement that no one was accusing defendant did not "rise to the level . . . to grant the defense application to suppress the statement[.]" Rather, the totality of circumstances demonstrated defendant voluntarily, intelligently, and knowingly waived his <u>Miranda</u> rights and participated in the interview.

We now review the trial court's determinations.

## C.

The Fifth Amendment to the United States Constitution guarantees that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself[.]" <u>U.S. Const.</u> amend. V. The Fifth Amendment right against self-incrimination has been made applicable to the states through the Due Process Clause of the Fourteenth Amendment. <u>Malloy v. Hogan</u>, 378 U.S. 1, 8 (1964).

The right against self-incrimination is also guaranteed by N.J.S.A. 2A:84A-19, which provides "every natural person has a right to refuse to disclose in an action or to a police officer or other official any manner that will incriminate him or expose him to a penalty or forfeiture of his estate[.]" Accord, N.J.R.E. 503 (same as N.J.S.A. 2A:84A-19).

Miranda warnings safeguard "a suspect's right against self-incrimination from the psychological pressure inherent in a police-dominated atmosphere that might compel a person 'to speak where he would not otherwise do so freely.'" State v. L.H., ____ N.J. ____, ____ (2019) (slip op. at 24) (quoting Miranda, 384 U.S. at 467). Federal Law requires that the government prove a suspect has waived his or her Miranda rights "by a preponderance of the evidence." Id. (slip op. at 24 n. 9) (quoting Colorado v. Connelly, 479 U.S. 157, 168 (1986)).

In contrast, in New Jersey "the State bears the burden of proving beyond a reasonable doubt that a defendant's waiver of his rights was made knowingly, intelligently, and voluntarily." Ibid. (citing State v. Nyhammer, 197 N.J. 383, 400-01 (2009)). In addition, due process "requires that the State 'prove beyond a reasonable doubt that a defendant's confession was voluntary and was not made because the defendant's will was overborne.'" Ibid. (quoting State v. Knight, 183 N.J. 449, 462 (2005)).

Our Supreme Court has recently reiterated that an interrogating police officer may use certain techniques to overcome a suspect's natural reluctance to incriminate himself in a crime. Id. (slip op. at 26). Thus, an officer may appeal to a suspect's sense of decency. Ibid. In addition, "[o]ur jurisprudence gives officers leeway to tell some lies during an interrogation." Ibid. (citing State v. Galloway, 133 N.J. 631, 655 (1993)).

On the other hand, certain techniques are prohibited. A police officer may not say or imply that a suspect's statements will not be used against him, because "[a] police officer cannot directly contradict, out of one side of his mouth, the Miranda warnings just given out of the other." Id. (slip op. at 27) (quoting State in the Interest of A.S., 203 N.J. 131, 151 (2010)). Nor may an interrogating officer tell a defendant he cannot "hurt himself and could only help himself by providing a statement[.]" Ibid. (quoting State v. Puryear, 441 N.J. Super. 280, 298 (App. Div. 2015)). Also prohibited are "false promises of leniency that, under the totality of the circumstances, have the capacity to overbear a suspect's will." Id. (slip op. at 24) (citing State v. Hreha, 217 N.J. 368, 383 (2014)).

A trial court's consideration of whether a suspect voluntarily, intelligently, and knowingly waived his Miranda rights and participated in a custodial interrogation should include an assessment of "the suspect's age, education and

A-4925-15T1

intelligence, advice concerning constitutional rights, length of detention, whether the questioning was reported and prolonged in nature, and whether physical punishment and mental exhaustion were involved." Galloway, 133 N.J. at 654 (citing Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973)). The court "should look to whether defendant has had previous encounters with law enforcement and the period of time between when Miranda rights were administered and when defendant confessed." Hreha, 217 N.J. at 383 (citing State v. Timmendequas, 161 N.J. 515, 614 (1999)).

Our review of a trial court's grant or denial of a motion to suppress a defendant's statement is deferential. State v. Vincenty, 237 N.J. 122, 131-32 (2019). If a trial court's findings are supported by sufficient, credible evidence present in the record, our task is complete and we should not disturb the result. State v. Johnson, 42 N.J. 146, 162 (1964). In contrast, we review de novo a trial court's legal conclusions. State v. Hubbard, 222 N.J. 249, 263 (2015).

Applying the foregoing principles to the facts in this case, we conclude the trial court's decision should be affirmed. The trial court's factual determinations concerning defendant's alertness, demeanor, steady hand, interaction with the detectives, and comprehension of his Miranda rights are amply supported by competent evidence in the record.

Sergeant Rodas' explanation to defendant about his right to an attorney, after defendant asked how an attorney would be obtained, perhaps could have been more detailed, but was nonetheless adequate. Contrary to defendant's argument, the record amply supports defendant's understanding of his right to counsel.

The detective's statement that defendant was not accused of anything, though technically accurate, was nonetheless misleading. The misleading nature of the statement, however, did not render defendant's statement involuntary.

A "government's failure to inform a suspect that a criminal complaint or arrest warrant has been filed or issued deprives that person of information indispensable to a knowing and intelligent waiver of rights." State v. A.G.D., 178 N.J. 56, 68 (2003). In so explaining, the Court noted "a criminal complaint and arrest warrant signify that a veil of suspicion is about to be draped on the person, heightening his risk of criminal liability." Ibid. For that reason, the court held the State cannot prove beyond a reasonable doubt a defendant had knowingly, intelligently, and voluntarily waived his Miranda rights "[w]ithout advising the suspect of his true status when he does not otherwise know it." Ibid.

Here, it is arguable that a criminal complaint or arrest warrant could have draped no greater veil of suspicion on defendant and could have indicated no

greater risk of criminal liability than existed as a result of the collective police investigation at the crime scene. That said, defendant has cited no authority that extends the holding in A.G.D. to the pre-complaint or pre-warrant stage of an investigation. Hence we do not find the Sergeant's misleading statement fatal to the State's use of defendant's statement at trial.

Sergeant Rodas' preliminary statement to defendant – "everyone has their story, their part they have to talk about" – was couched in mandatory terms, contrary to the Miranda warnings, and contrary to a suspect's right to remain silent. Although the issue is one on which reasonable minds might differ, our standard of review requires us to defer to the trial court's fact finding. Adhering to our standard of review, we cannot conclude the trial court's determination – the Sergeant's remarks did not render defendant's waiver of his Miranda rights involuntary, unknowing, or unintelligent – was "clearly mistaken." State v. S.S., 229 N.J. 360, 374 (2017) (quoting State v. Elders, 192 N.J. 224, 250 (2007)). Accordingly, we affirm the trial court's decision denying defendant's motion to suppress his statement to police.

### III.

Next, defendant argues the trial court committed reversible error when it refused to charge the jury on self-defense and passion-provocation manslaughter. We agree.

### A.

During the charge conference, as the court and the parties discussed the offense of possession of a weapon for an unlawful purpose, defense counsel commented defendant possessed the knife "for the purpose of self[-]defense." The court responded:

> That then implicates the requirement that the State disprove self[-]defense beyond a reasonable doubt. There's no self[-]defense in this case. Even . . . exercising my independent obligation to search the record, even without a request, I see absolutely nothing beyond raw speculation that the defendant was faced with deadly force . . . the nature of which justified his use of deadly force to protect himself.

In response, defense counsel pointed out that in his statement to police, defendant said the victim had "gone for a knife" and was going to "stick it in [him], and . . . she fell on it." The court questioned the impact a self-defense charge would have on the defense that defendant did not act knowingly or purposefully because of the degree of his intoxication.

During further discussion, the court commented defendant's failure to file a notice that he would be asserting self-defense, as required by Rule 3:12, "I think is dispositive of the issue." The court added, "I think that to charge the jury on self[-]defense under the evidential record before it will simply inflame the jury. I can't imagine the jury looking at the photographs of [the victim] and consider the defense of self[-]defense in that context and not be outraged by it." The court also questioned how it could "now impose upon the State an obligation to disprove self[-]defense beyond a reasonable doubt when the State had no pretrial notice of it and [had] rested."

The court added:

> [T]here is insufficient evidence before this [c]ourt to establish a rational basis for charging the jury with self[-]defense in this case. . . . Defendant's use of force, as articulated by counsel, constituted an exercise of the application of deadly force in face of evidence which shows that the force being used toward the defendant put him in de minimis danger of serious bodily injury or death.
>
> Further, a reasonable review of the evidence is, as [the prosecutor] has characterized it, indicia of self-defense by a person literally fighting for her life.
>
> Justification by self-defense further is unavailable if some lesser[-]degree of force could have been used to respond to an attack. So let's assume that [the victim] suffered a level of aggravation over not being paid for her prospective services that created in

34

her the initiative to attack [defendant]. The evidence of that attack is, as I have characterized it, injuries that you would get from aggravating a cat. They are not injuries which would establish, on any rational basis, the justification for the use of deadly force in response.

Because defendant had not provided notice he intended to assert self-defense, because the court saw no basis in the record for it, and because the court believed a charge on self-defense would inflame the jury and deprive defendant of a fair trial, the court refused to instruct the jury on self-defense.

The New Jersey Code of Criminal Justice, N.J.S.A. 2C:1-1 to 104-9, provides, "[t]he court shall not charge the jury with respect to an included offense unless there is a rational basis for a verdict convicting the defendant of the included offense." N.J.S.A. 2C:1-8(e). The statute has been interpreted to require a rational basis in the evidence not only "for a jury to convict the defendant of the included offense but . . . also . . . for a jury to acquit the defendant of the charged offense before the court may instruct the jury on an uncharged offense." State v. Brent, 137 N.J. 107, 113-14 (1994) (emphasis in original) (citation omitted).

"The rational-basis test sets a low threshold." State v. Carrero, 229 N.J. 118, 128 (2017) (citing State v. Crisantos, 102 N.J. 265, 278 (1986)). "As long as a self-defense charge is requested and supported by some evidence in the

record, it must be given." State v. Rodriguez, 195 N.J. 165, 174 (2008). Thus, "if 'any evidence raising the issue of self-defense is admitted in either the State's or the defendant's case, then the jury must be instructed that the State is required to prove beyond a reasonable doubt that the self-defense claim does not accord with the facts.'" State v. O'Carroll, 385 N.J. Super. 211, 236 (App. Div. 2006) (quoting State v. Burks, 280 N.J. Super. 595, 604 (App. Div. 1986)).

Significantly, "[i]n deciding whether the rational-basis test has been satisfied, the trial court must view the evidence in the light most favorable to the defendant." Carrero, 229 N.J. at 128 (citing State v. Mauricio, 117 N.J. 402, 412 (1990)). Equally significant, "[a] defendant is entitled to a lesser-included offense instruction rationally supported by the evidence, even if the instruction is inconsistent with the defense theory." Ibid. (citing State v. Brent, 137 N.J. 107, 118 (1994)).

Here, as part of its case, the State played the entire video recording of defendant's statement. In that statement, defendant said that when he told the victim she could not leave with his money, the victim took a knife and attacked him with it. According to defendant's statement, the victim "got all over me with the knife[.]" The defendant said in his statement that he and the victim fought and wrestled, and when he moved to the side, she followed him. When

specifically asked, he said he never took the knife from her.  Rather, as the altercation moved into the bedroom, and he was still struggling to keep her from stabbing him, she tripped on the bed, fell on the dresser while they were both holding the knife, and "[t]hat was when it went in her [neck]."

The trial court declined to charge on self-defense because defendant had not timely notified the State.  If the State had evidence to disprove self-defense that it did not present due to the lack of notice, it could have requested permission to reopen its case and present the evidence.  Regardless, the State's own case included "evidence in the record" that supported a self-defense charge. Rodriguez, 195 N.J. at 174.

The State contends the force defendant used against the victim "was grossly disproportionate to the alleged force used by [the victim], which resulted in only relatively minor injuries for which defendant declined any medical attention."  The State overlooks, as did the court, defendant's version of events that he sustained the injuries in an attempt to prevent the victim from stabbing him.

In short, defendant requested the self-defense charge and it was supported by evidence in the record.  Rodriguez, 195 N.J. at 174; O'Carroll, 385 N.J. Super.

at 236.  The trial court should have granted defendant's request for a jury instruction on self-defense.

B.

We reach the same result concerning defendant's request, and the court's denial, of a jury instruction on passion-provocation manslaughter.

> Passion/provocation manslaughter has four essential elements: [1] the provocation must be adequate; [2] the defendant must not have had time to cool off between the provocation and the slaying; [3] the provocation must have actually impassioned the defendant; and [4] the defendant must not have actually cooled off before the slaying.  The first two elements are assessed objectively, while the third and fourth are more subjective because they relate to the defendant's actual response.  To warrant the passion/provocation jury charge, the evidence must rationally support only the first two elements; the subjective elements should usually be left to the jury to determine.
>
> [Carrero, 229 N.J. at 129 (citations omitted).]

Although words alone cannot satisfy the first element, the presence of a gun or knife can, and "[b]attery is also considered adequate provocation 'almost as a matter of law.'"  Ibid. (citing Mauricio, 117 N.J. at 414).

Viewing the evidence in the light most favorable to defendant, a factfinder could determine that the victim grabbed the knife and attempted to stab him. That conduct and the ensuing struggle, if believed, rose to the level of adequate

provocation. Id. at 130. According to defendant's statement, there was not a cooling off period. The trial court thus should have granted defendant's request to charge passion-provocation manslaughter.

C.

It is beyond dispute that "[a]ppropriate and proper charges to a jury are essential for a fair trial." Carrero, 229 N.J. at 127 (quoting State v. Daniels, 224, N.J. 168, 180 (2016)). Moreover, the Supreme Court has "repeatedly held that 'erroneous instructions on material points are presumed to be reversible error.'" Ibid. (quoting State v. Nelson, 173 N.J. 417, 446 (2002)). Here, the trial court's refusal to grant defendant's request to charge self-defense and passion/provocation manslaughter, despite evidence in the State's case raising those issues, constituted reversible error. Accordingly, we reverse and remand for a new trial.

In view of our decision, we need not address defendant's argument that his sentence is excessive.

Reversed and remanded for a new trial. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4925-15T1