**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2125-21

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

ZAKEEM D. BROWN,
a/k/a ZIGGY,

     Defendant-Appellant.

_____

Argued November 1, 2023 – Decided November 28, 2023

Before Judges Firko and Susswein.

On appeal from the Superior Court of New Jersey, Law Division, Mercer County, Docket No. 17-04-0196.

Rochelle Mareka Amelia Watson argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Elizabeth C. Jarit, of counsel and on the briefs; Rochelle Mareka Amelia Watson, of counsel and on the brief).

Lauren Cohen argued the cause for amicus curiae American Civil Liberties Union of New Jersey and Rutgers Criminal and Youth Justice Clinic (Alexander

Shalom and Jeanne LoCicero, attorneys, on the brief; Laura Cohen, of counsel and on the brief).

Colin J. Rizzo, Assistant Prosecutor, argued the cause for respondent (Angelo J. Onofri, Mercer County Prosecutor, attorney; Colin J. Rizzo, of counsel and on the brief).

PER CURIAM

Defendant Zakeem Brown appeals from an August 20, 2018 Law Division order denying his motion to suppress incriminating statements he made to detectives investigating a homicide. Defendant, who was seventeen years old at the time of the homicide and ensuing custodial interrogation, eventually pled guilty in adult court to an amended charge of first-degree aggravated manslaughter. He argues the interrogating detectives violated his Miranda[1] rights by imposing restrictions on his mother's participation in the interrogation, abrogating her role as a buffer and advisor. He claims, for example, that detectives encouraged her to remain quiet. Defendant further claims that when she left the interrogation room at defendant's request, she was neither offered a chance to monitor the electronically-recorded interrogation, nor advised that she could return to the interrogation room at any time. Defendant further argues he was not afforded an opportunity to consult privately with her after the Miranda

---

[1]  Miranda v. Arizona, 384 U.S. 436 (1966).

warnings were administered.  Nor was he informed of his right to ask his mother to return to the interrogation room after he asked her to step out.

After reviewing the record in light of the arguments of the parties and the governing legal principles, and after carefully considering the totality of relevant circumstances that militate for and against a finding of voluntariness, we conclude the State failed to meet its heavy burden of proving beyond a reasonable doubt that defendant knowingly and voluntarily waived his Miranda rights.  Although no one circumstance categorically compels suppression, we conclude the cumulative effect of the police tactics regarding the parent's participation in the interrogation creates a reasonable doubt as to the voluntariness of defendant's incriminating statements.

We therefore reverse the denial of the suppression motion and vacate his conviction.  We reject, however, defendant's request—which is joined by amici American Civil Liberties Union of New Jersey and the Rutgers Criminal and Youth Justice Clinic (collectively, defense amici)—that we create a new per se rule requiring that juveniles consult with appointed counsel before waiving Miranda rights.

I.

A-2125-21

In April 2017, defendant was charged by indictment with first-degree murder, N.J.S.A. 2C:11-3(a)(1); first-degree robbery, N.J.S.A. 2C:15-1(a)(1); first-degree felony murder, N.J.S.A 2C:11-3(a)(3); second-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b)(1); and second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a)(1).

In September 2017, defendant moved to suppress incriminating statements he made to police during the electronically-recorded custodial interrogation. The suppression hearing was convened on August 20, 2018. At the conclusion of the hearing, the motion court issued an oral opinion concluding that defendant's Fifth Amendment rights had not been violated.

On January 7, 2020, defendant pled guilty to first degree murder. However, on February 19, 2020, defendant moved to withdraw his guilty plea. That motion was granted in April 2021.

In September 2021, the State moved to dismiss the counts charging felony murder, first-degree robbery, and second-degree unlawful possession of a weapon. The case proceeded to trial on the remaining counts charging knowing/purposeful murder and possession of a weapon for an unlawful purpose. A mistrial was declared after the jury could not reach a unanimous verdict.

4

On December 7, 2021, defendant pled guilty to an amended charge of aggravated manslaughter pursuant to a plea agreement.[2] On February 25, 2022, defendant was sentenced to a twenty-year prison term subject to the No Early Release Act, N.J.S.A. 2C:43-7.2.

Defendant raises the following contentions for our consideration:

POINT I

> THE POLICE OBTAINED STATEMENTS IN VIOLATION OF THE PROTECTIONS REQUIRED OF JUVENILE INTERROGATIONS AND AS A RESULT OF PROHIBITED INTERROGATION TACTICS, INCLUDING BY ENCOURAGING DEFENDANT'S MOTHER TO ALLOW THE INTERROGATION OF HER CHILD IN HER ABSENCE AND BY REQUESTING THAT SHE REFRAIN FROM INTERVENING DURING QUESTIONING.
>
>> A. The State Failed To Establish That The Waiver And Subsequent Statements Were Made Knowingly, Intelligently, And Voluntarily Under Presha And Its Progeny.[3]
>>
>> B. Alternatively, This Case Demonstrates That Juveniles Must Be Provided Counsel During Custodial Interrogations In Order To Fully Protect Their Constitutional Rights.

---

[2] As part of his guilty plea, defendant preserved the right to appeal the denial of the motion to suppress his statement to police. See R. 3:9-3(f).

[3] State v. Presha, 163 N.J. 304 (2000).

POINT II

RESENTENCING IS REQUIRED BECAUSE THE COURT'S REASONS FOR FINDING AGGRAVATING FACTORS LACKED BASES GROUNDED IN ANY EVIDENCE IN THE RECORD, AND THE REJECTION OF MITIGATION EVIDENCE IS CONTRARY TO SETTLED LAW.

Amici raise the following contentions:

POINT I

DUE TO THEIR DEVELOPMENTAL IMMATURITY, YOUNG PEOPLE FACE UNIQUE AND SIGNIFICANT RISKS DURING CUSTODIAL INTERROGATIONS.

A. Ongoing Brain Development Negatively Affects Adolescents' Judgment And Decision-Making, Especially In Stressful Situations.

B. Young People Are Less Able to Understand And Knowingly, Intelligently, And Voluntarily Waive Their Legal Rights Than Adults.

C. Developmental Immaturity Breeds False Confessions.

D. Youth Of Color Are More Vulnerable to Standard Police Interrogation Techniques And More Likely To Waive Their Constitutional Rights Involuntarily Than White Youth.

POINT II

6

IN LIGHT OF THESE VULNERABILITIES, YOUTH MUST BE AFFORDED ACCESS TO AND CONSULTATION WITH COUNSEL BEFORE BEING ASKED TO WAIVE THEIR LEGAL RIGHTS.

      A. Parental Presence Is Inadequate Protection For Children Subjected To Police Interrogation.

      B. Consultation With Counsel Is A Sine Qua Non Of Valid Miranda Waivers By Youth.

II.

We discern the following facts from the suppression hearing. Because we must consider the totality of the circumstances in determining whether defendant knowingly and voluntarily waived his right against self-incrimination, we recount the facts in considerable detail. The State relied on the testimony of one of the interrogating officers, Detective Robert Booth, the electronic recording of the stationhouse interrogation, see R. 3:17, and a recording of the police colloquy with defendant's mother after she left the interrogation room.

On May 11, 2016 at approximately 9:50 p.m., the victim, Ricardo Montalvan Jr., was shot and killed while sitting in a vehicle in the area of Whittaker Avenue in Trenton. Police officers responded to the scene and located Divon Ray hiding under a car nearby. Officers obtained security camera footage near the scene of the crime that showed two individuals, later determined to be Ray and defendant.

Ray admitted to police that he and another individual were in the vicinity of the shooting. Initially, Ray refused to name the other person. After being shown photographs, he identified defendant as the other individual. Ray told police that after spotting the victim sitting in his vehicle, defendant used a gun to take the victim's cell phone while Ray stood nearby.

On May 16, 2016, defendant and his mother, Latoya Brown (Latoya)[4] were brought to the homicide task force office. Once at the office, Detective Booth and Detective Nancy Diaz initially spoke privately with Latoya. Booth informed Latoya that they wished to speak with defendant and told her, "because he's a juvenile, we want to – we need your permission to speak with him."

The following exchange then occurred between Latoya and the detectives:

> Detective Booth: [W]hat we want to avoid, is—is us talking to your—to your son without your knowledge. That being said, when we do speak with him, he—he has every right, just like an adult, as far as it goes with [Miranda]. You know, right to remain silent and–and all the enumerated [Miranda] rights. However, because he is a juvenile . . . you're his guardian. Correct?
>
> [Latoya]: Yes, I am.
>
> Detective Booth: So you'd have to speak with him. And we'd let you explain those rights to him, if—if you wanted to.

---

[4] Because defendant and his mother share the same last name, we use her first name to avoid confusion. We mean no disrespect in doing so.

[Latoya]: Yes.

Detective Booth: Okay.  We'd like to interview him. Sometimes I've had experience where it goes—where it's more fruitful when a—a guardian is in the room and sometimes better— better when a guardian is not there. (Inaudible)

[Latoya]: No, it's going to go better with me in the room.  And I'm going to tell him if he did something, he need to own up to it or if he knows something, he need to tell it.  Because he know I don't play.  I don't play.

Detective Booth: The only thing I—I'd ask is, when we do start speaking with him, you—we'll bring him in. You'll be sitting right there.  He will be present.  When we do start speaking with him, if you let us

Detective Diaz: Yeah.  Just

Detective Booth:  do our job.

Detective Diaz: Right.  As much as you can contain yourself to try to—you know, allowing us to speak to him, but let us do the interview.  I mean, honestly, you're going to be there, but let us talk to him.  Okay?

Detective Booth: Okay.  You said last week— well. . . we'll get to that when we get to that.  Let's—let's step out.  We'll get him to come in and then I'll read to— there's a form I got to read to him and to you and I'll have you both sign those rights that—that I was talking about.

[Latoya]: Okay.

Detective Diaz: Then we'll talk about it.  Okay?

9

Detective Booth: Do you have any questions before we start?

[Latoya]: Uh-huh. I have none.

Detective Booth: Okay. All right. Give me a minute. I appreciate your cooperation, too. I know this is—this is a difficult situation, but right now, you know, we'll—we'll do what we can right now to . . . minimize this situation and go from there. Okay?

[Latoya]: Uh-huh.

Detective Booth: If at any time you do have a question or anything, just let me know.

[Latoya]: Uh-huh.

Detective Booth: All right. Thanks.

Defendant was then brought into the interrogation room and informed of his rights in the following colloquy:

Detective Booth: All right, guys. Sorry to (inaudible), you know, wake you up like this and to disturb you on this morning. I was just explaining to your mom that I wanted to speak with you about a few different things. In order for me to do that, because you are 17, your mom has to be present or she has to sign off on—on a form that says that I can speak with you without her permission (sic). She's elected to be present so there's a couple—there's a little bit of paperwork that goes along with that. We are going to get through that and then I'm sure you guys are—are anxious to see what we want to ask you about.

10

[Latoya]: Uh-huh. I'm sure he is.

   . . . .

Detective Booth: Okay. [Defendant], before you—yeah. I'm going to read you these rights, these <u>Miranda</u> rights. At any time if you have any questions or you don't understand anything, either of you, please let me know. Okay. Before we ask you any questions, you must understand your rights. You have the right to remain silent. Do you understand that?

Defendant: Yes.

[Latoya]: Uh-huh.

Detective Booth: Okay. Anything you say may be used—used against you in court. Do you understand that?

Defendant: Uh-huh.

Detective Diaz: Okay.

Detective Booth: Yes. Okay. You have the right to talk to a lawyer for advice before we ask you any questions and have him with you during questioning. Do you understand that?

Defendant: (Inaudible).

Detective Booth: I need you to say yes.

Defendant: Yes.

[Latoya]: Yes.

A-2125-21

Detective Booth: Okay. If you cannot afford an attorney, one will be appointed for you before any questioning if you wish. Do you understand that?

Defendant: Yes.

[Latoya]: Yes.

Detective Booth: Okay. If you decide to answer questions now without a lawyer present, you will still have the right to stop answering at any time. You also have the right to stop answering at any time until you talk to a lawyer. Do you understand that?

Defendant: Yes.

[Latoya]: Yes.

Detective Booth: Okay. All right. This one says I acknowledge that I've been advised of the rights listed above. I understand my rights and am willing to waive them and speak with the police. Are there any questions that you guys have?

[Latoya]: Nope.

Defendant: No.

Detective Booth: Okay. What I'm going to do is I'm going to have [defendant] sign this. If you guys wish to waive your rights, I'm going to have him sign it and I'm going to have you sign it right below. Okay? [defendant], I'm going to have you sign that right there. And, mom, I'm going to have you sign that there.

[Latoya]: Underneath him?

Detective Diaz: Right here.

A-2125-21

Police eventually revealed to defendant that they were investigating a shooting, and that there was a "video of [defendant and Ray] walking from this location intermittently to that location. . . . [a]nd . . . there's a video camera that captures the incident. . . . it looks like a robbery that goes bad."

Defendant claimed he was not in the area of Elmer and Whittaker, but rather was on Hamilton Avenue walking towards the vicinity of Monmouth Street when he heard shots that he believed at the time were firecrackers. Defendant was unclear if he was by himself or with a person whom he identified as Roman.

The following exchange then occurred:

> Detective Booth: Okay.  Okay.  [Defendant], what you just told me is moot.  Here's the thing.  We talked to a lot of people.  That's my job, I talk to people.  Right. And, unfortunately or fortunately, a lot of times when I talk to people, they don't tell me the truth right away. And I understand that.
>
> However, after talking with so many people, you kind of get to learn who is telling the truth and who's not.  And right now you're not telling the truth.  Okay.
>
> I'm pretty sure mom knows this, because mom probably knows—
>
> Detective Diaz: That—you better than anybody.

Detective Booth: —if you're—you're telling the truth better than—than we do. Right? But that's—that's the issue that we have. Now from what I can tell, okay, whatever happened that night probably got out of hand. All right. Whatever happened, you probably didn't mean it to happen, but it happened. Okay. Now the question isn't what happened or who did what. The question is where do we go from here. All right.

Detective Diaz: Uh-huh.

Detective Booth: How old are you?

Defendant: Seventeen.

Detective Booth: You are [seventeen] years old. You've got the rest of your life –

Detective Diaz: Your whole life ahead of you.

Detective Booth: —ahead of you.

[Latoya]: Uh-huh.

Detective Booth: Okay. I don't want this incident or you not telling the truth about this incident to affect, you know, the—the rest of your life. Do you understand what I'm saying? So it's real important that you—you know, I'm not going to lie to you. Okay. I don't want you to lie to me. All right. We already know what happened.

Detective Diaz: Uh-huh.

Detective Booth: We already know, basically, everything about it. Right now we want to speak with you and we want you to clarify a few things. Okay. And we want to—we want to get this, you know, to

14

where I can say you came in here and from that point on, you know, mistakes were made, but here the truth came out. Okay. And we can move on with this and put this behind us. Do you understand what I'm saying? Can you tell me exactly what happened that night?

Defendant: Um. Me and . . . Divon met up with —

[Latoya]: Hold on. Would you like me to step out?

Defendant: Huh? Yeah.

Detective Booth: Is that what you want?

Detective Diaz: (Inaudible). Do you (inaudible)

[Latoya]: If he's—if this is what's going [to] happen, then I don't—he don't want to hurt me.

Detective Booth: I understand.

[Latoya]: I know he don't want . . . to hurt me.

Detective Booth: I understand.

[Latoya]: So I don't want him to hurt me either.

Detective Diaz: And let me say something

Detective Booth: Okay.

Detective Diaz: —to you before, I think that you're going to do the right thing. It sounds like you're going to tell us the truth, like he said. This woman has sacrificed a lot for you. Okay. And the fact that you see her hurting here, you owe her that. Okay. You owe her to—to tell the truth. Not to sit here and lie because I don't think that's the way she raised you. Correct?

15

A-2125-21

Defendant: Uh-huh.

Detective Diaz: Okay. So . . . tell us what really happened that night. Because we already know. We just need you to tell us and clarify some things for us. Okay?

Defendant: Uh-huh.

Detective Diaz: She doesn't want to be here anymore, I'm going to step out with her. I'll come back in, but give her that respect. Okay?

Detective Booth: Do you want to—

Detective Diaz: Give me a second.

([Latoya] escorted out of room by Detective Diaz).

Detective Booth: Listen, I know this is tough. Whatever I can do to help you out in this situation, okay, I'll do. All right. That being said, I wasn't lying when I said we need to know the truth about what happened.

Following this exchange, defendant made numerous incriminating statements. He claimed, for example, that on a prior occasion, the victim along with other assailants "jumped" him.

Defendant then admitted:

We stopped right there. Divon was like that's Ricky right there. I was like where. And he was like right there, whatcha gonna do. I'm like I'm going to scare him. As soon as I said that, Divon—I'm like, bro,

16

remember me. And he was like, oh, shit. And then when I said that, Divon said—yelled my name, and it—it startled me and like, boom and the second time boom. I hurried up and put it down, like I threw it down because I ain't really mean to— I ain't mean to shoot at him or nothing. I was just trying to just scare him, like. Like, oh, yeah, stop messing—you're gonna stop messing with him. Boom. Because he jumped me multiple times and he keep jump—he jumped me every other—every chance they get. And I'm not running. I don't be running from them, so.

### III.

Following testimony and arguments from counsel, the judge issued an oral decision from the bench. The judge summarized defendant's contentions. First, "defendant argue[d] that the detectives improperly told [Latoya] that she should—she should not interfere or interject herself into the interrogation." Next, "defendant argue[d] that [Latoya] was also not separately advised of her rights as a parent to act on her son's behalf . . . . [and] the detectives improperly used [Latoya] . . .to clarify certain facts." Defendant also contended that "detectives improperly 'pounded on the opportunity' to question defendant without [Latoya]'s presence after she offered to leave." Finally, defendant contended that Latoya failed to give consent to detectives to speak to defendant without her present when she went into another room, prior to defendant's confession.

17

The motion judge rejected those contentions and found defendant made a knowing and voluntary waiver of his Miranda rights. The judge found "the detective's instruction that [Latoya] not interject too often had little to no bearing on the defendant's ability to understand his rights or to waive them."

The judge also considered the impact of Latoya leaving the interrogation room, explaining:

> [Latoya] clearly offered to leave the room so that her son might feel more comfortable telling the truth. It was just after this that the defendant finally gave a more detailed account of his role and ultimately confessed to the shooting. This [c]ourt is required to take in[to] account the fact that [Latoya] left the interrogation room as a highly significant factor in its analysis of the totality of circumstances. However, similar to cases of Q.N. [5] and Presha, [Latoya] left the room after which she enabled her son to tell the truth. As such, the [c]ourt takes no issue with this in this case.

This appeal followed.

IV.

We begin our analysis by acknowledging the legal principles governing this appeal, starting with the foundational principle that the scope of our review of a suppression hearing is limited. See State v. Handy, 206 N.J. 39, 44-45 (2011). We "must uphold the factual findings underlying the trial court's

---

5 State ex rel. Q.N., 179 N.J. 165, 173 (2004).

decision so long as those findings are supported by sufficient credible evidence in the record." Id. at 44 (quoting State v. Elders, 192 N.J. 224, 243 (2007)). "An appellate court 'should give deference to those findings of the trial judge which are substantially influenced by his [or her] opportunity to hear and see the witnesses and to have the "feel" of the case, which a reviewing court cannot enjoy.'" Elders, 192 N.J. at 244 (quoting State v. Johnson, 42 N.J. 146, 161 (1964)).

In contrast to the deference we owe to a trial court's factual and credibility findings, we review a trial court's legal conclusions de novo. S.S., 229 N.J. at 380. Because issues of law "do not implicate the fact-finding expertise of the trial courts, appellate courts construe the Constitution, statutes, and common law de novo—with fresh eyes—owing no deference to the interpretive conclusions of trial courts, unless persuaded by their reasoning." Ibid. (internal quotation marks omitted) (quoting State v. Morrison, 227 N.J. 295, 308 (2016)); see also Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995) (noting that appellate courts are not bound by a trial court's interpretations of the "legal consequences that flow from established facts"). In the event of a mixed question of law and fact, we review a trial court's determinations of law

de novo but will not disturb a court's factual findings unless they are "clearly erroneous." State v. Marshall, 148 N.J. 89, 185 (1997).

Turning to substantive legal principles, the right against self-incrimination is "[o]ne of the most fundamental rights protected by both the Federal Constitution and state law. . . . " State v. O'Neill, 193 N.J. 148, 167 (2007). It is well-settled that "[c]onfessions obtained by the police during a custodial interrogation are barred from evidence unless the defendant has been advised of his or her constitutional rights." State v. Knight, 183 N.J. 449, 461 (2005). A waiver of the constitutional right against self-incrimination must be voluntary, knowing, and intelligent. Ibid. (citing Miranda, 384 U.S. at 444).

The standard for reviewing the validity of a waiver is especially strict under New Jersey law, which provides criminal suspects greater protections than are afforded under the United States Constitution. In State v. Erazo, our Supreme Court reaffirmed that "[w]ith respect to the trial court's admission of police-obtained statements, . . . an appellate court 'should engage in a "searching and critical" review of the record to ensure protection of a defendant's constitutional rights.'" 254 N.J. 277, 297 (2023) (quoting State v. Hreha, 217 N.J. 368, 381-82 (2014)). Importantly, moreover, our law requires the State to prove a valid waiver beyond a reasonable doubt. State v. O.D.A.-C., 250 N.J.

408, 420 (2022). Federal law, in contrast, requires proof the waiver was valid by the much lower preponderance-of-the-evidence standard. Ibid. (quoting Colorado v. Connelly, 479 U.S. 157, 168 (1986)).

When determining whether the State satisfied its burden that a waiver was knowing, intelligent and voluntary, a court must consider the "totality of the circumstances," which includes factors such as the defendant's "age, education and intelligence, advice concerning constitutional rights, length of detention, whether the questioning was repeated and prolonged in nature, and whether physical punishment or mental exhaustion was involved." Knight, 183 N.J. at 462-63 (quoting State v. Galloway, 133 N.J. 631, 654 (1993)). Additionally, a court may consider the defendant's "previous encounters with law enforcement, and the period of time between 'administration of the [Miranda] warnings and the volunteered statement.'" Id. at 463 (alteration in original) (quoting State v. Timmendequas, 161 N.J. 515, 614 (1999)).

Importantly for purposes of this appeal, the standard for establishing a valid waiver of Miranda rights is heightened when juveniles are subjected to custodial interrogation. State in Int. of A.A., 240 N.J. 341, 354 (2020). Our courts recognize that "juveniles – teenagers and children alike – are typically less mature, often lack judgment and are generally more vulnerable to pressure

21

than adults." Ibid. (citing J.D.B. v. North Carolina, 546 U.S. 261, 272-73 (2011)). Consequently, "the greatest care must be taken" to assure that a juvenile's statement during custodial interrogation is voluntary, "in the sense not only that it was not coerced or suggested, but also that it was not the product of ignorance of rights or of adolescent fantasy, fright or despair." In re Gault, 387 U.S. 1, 55 (1967).

In Presha, our Supreme Court held that juvenile interrogees have the right to have a parent or guardian present when Miranda warnings are administered. 163 N.J. at 322 (2000). The Court explained,

> [w]hen younger offenders are in custody, the parent serves as a buffer between the juvenile, who is entitled to certain protections, and the police, whose investigative function brings the officers necessarily in conflict with the juvenile's legal interests. Parents are in a position to assist juveniles in understanding their rights, acting intelligently in waiving those rights, and otherwise remaining calm in the face of an interrogation.
>
> [Presha, 163 N.J. at 315 (citing Gallegos v. Colorado, 370 U.S. 49, 54 (1962)).]

In A.S., the Court further commented, "'[t]he role of a parent in the context of a juvenile interrogation takes on special significance,' because '[i]n that circumstance, the parent serves as advisor to the juvenile, [and] someone who

can offer a measure of support in the unfamiliar setting of the police station." 203 N.J. at 147 (alterations in original) (quoting Presha, 163 N.J. at 314).

In A.A., the Court recently confirmed "[t]he protections outlined in Presha remain good law." A.A., 240 N.J. at 358. The Court announced further guidance, ruling that "[t]he police should advise juveniles in custody of their Miranda rights – in the presence of a parent or legal guardian – before the police question, or a parent speaks with, the juvenile." Id. at 358. Furthermore, the Court instructed that police should then "give parents or guardians a meaningful opportunity to consult with the juvenile in private about those rights." Ibid. The Court emphasized that "[i]f law enforcement officers do not allow a parent and juvenile to consult in private, absent a compelling reason, that fact should weigh heavily in the totality of the circumstances to determine whether the juvenile's waiver and statements were voluntary." Id. at 359.

However, our Supreme Court has never announced a categorical rule with respect to the participation of a parent in a custodial interrogation of a seventeen-year-old interrogee. The absence of a parent or legal guardian will not automatically render a statement inadmissible, particularly when the juvenile providing the statement is over the age of fourteen. See Presha, 163 N.J. at 308, 317; see also State ex rel. A.S., 203 N.J. 131, 148-49 (2010). Instead, an

interrogation may be conducted without parental participation so long as the officers act with "the utmost fairness and in accordance with the highest standards of due process and fundamental fairness." Presha, 163 N.J. at 317 (first quoting S.H., 61 N.J. 108, 115 (1972); then citing State v. R.W., 115 N.J. Super. 286, 296 (App. Div. 1971)).

We add that the parental participation rule announced in Presha, and recently restated in A.A., does not displace the totality-of-the-circumstances test but rather is a critical part of it. The A.S. Court stressed that point, explaining, "the presence of a parent is a 'highly significant factor' in the totality of the circumstances analysis contemplated by Presha . . . ." 203 N.J. at 154 (emphasis in original).

## V.

We next apply these basic Fifth Amendment principles to the matter before us. We first address defendant's contention the detectives' pre-interrogation discussion with Latoya functioned to abrogate her role as a buffer and advisor to defendant.

While speaking to Latoya, Booth commented that while he needed her permission to speak to defendant and she could be in the room, it was "sometimes better -- better when a guardian is not there." Furthermore, Diaz

instructed Latoya that while she could be in the interrogation room, she must "contain [her]self to try to -- you know, <u>allowing us to speak to him</u>, <u>but let us do the interview</u>.  I mean honestly, you're going to be there, <u>but let us talk to him</u>." (emphasis added).

We conclude the admonition to "contain yourself" and "let us talk to him" improperly encroached upon her role as a buffer by limiting her participation, suggesting she should be a mere spectator and refrain from interrupting police questioning.  We acknowledge from the context of the conversation that the detectives may have been concerned that Latoya might assume the role of interrogator and that their instruction that she "contain herself" and "let us do the interview" was meant to safeguard rather than denigrate defendant's Fifth Amendment rights.  <u>See</u> <u>State in the Int. of M.P.</u>, 476 N.J. Super. 242, 267 (App. Div. 2023) ("The actual role played by a parent during a stationhouse interrogation—whether as a "buffer" or instead as an adjunct law enforcement interrogator—is a fact-sensitive question to be determined on a case-by-case basis.").  But we do not focus on the officers' subjective intent.  <u>See</u> <u>State v. Diaz</u>, 470 N.J. Super. 495, 523-24 (App. Div. 2022), <u>leave to appeal denied</u>, 251 N.J. 8 (2022) ("We emphasize that under the analytical approach we follow in this case, we do not focus on the detectives' subjective intent but rather on the

reasonably likely impact of their overall conduct on defendant's understanding of his true status and predicament."). Rather, we consider the potential effect the detectives' comments might have had on Latoya's understanding of her role in the interrogation room.

We are troubled the detectives' instructions to Latoya before the interrogation could have discouraged her from intervening and posing questions to the interrogating detectives, and not just to refrain from posing substantive questions to her son. We conclude the detectives essentially asked her to be more passive during the interrogation without clearly explaining that she was under no obligation to "let [the officers] do the interview." Indeed, they failed to convey that in her role as a buffer and advisor, she had the right throughout the interrogation to protect her son from the questions posed to him. Given the allocation of the burden of proof, moreover, we construe any ambiguity as to the meaning and impact of the detective's pre-interrogation remarks to Latoya against the State, leading us to conclude that the pre-interrogation discussion militates against a finding that the ensuing waiver of constitutional rights was knowing and voluntary.

We are even more concerned that the detectives did not provide an opportunity for mother and son to discuss privately whether to waive Miranda

A-2125-21

rights after they were administered. We reiterate and stress that the Court in A.A. held that "[i]f law enforcement officers do not allow a parent and juvenile to consult in private, absent a compelling reason, that fact should weigh heavily in the totality of the circumstances to determine whether the juvenile's waiver and statements were voluntary." 240 N.J. at 359. Here, the State offers no compelling reason to excuse the failure to allow for a private consultation.

We add that in M.P., we determined the guidance announced in A.A. has retroactive effect, noting,

> [t]he guidance provided in A.A. was a logical extension of Presha. Furthermore, as the State acknowledges, the Court did not create a per se rule requiring police to allow for the interrogee and parent to consult privately after the warnings are read but before Miranda rights are waived. Instead, the pronouncement in A.A. was stated as "guidance" as to what police "should" do. 240 N.J. at 358. Relatedly, the Court held that the failure to provide an opportunity for private consultation after Miranda warnings are administered is a relevant circumstance that "should weigh heavily" in a reviewing court's totality-of-the circumstances analysis. Id. at 359. The Court did not suggest, much less hold, that any such failure automatically triggers the exclusionary rule as if, for example, the police had omitted a warning. Identifying a particular factor to be considered as part of an inherently holistic test hardly "breaks new ground." See Teague [v. Lane], 489 U.S. [288,] 301 [1989]. To the extent A.A. amplified the existing totality-of-the-circumstances test, rather than mandated a new rule of police procedure, its rationale

27

> should be given retroactive effect. See [State v.] Feal, 194 N.J. [293,] 308 [2008].
>
> [M.P., 476 N.J. Super. at 293.]

At oral argument before us, the State acknowledged this portion of M.P., stating it would not argue against retroactive application of the A.A. guidance in this matter.

We thus conclude the failure to afford an opportunity for private consultation following administration of the Miranda warnings "weigh[s] heavily" against a finding that defendant knowingly and voluntarily waived his Miranda rights. See A.A., 240 N.J. at 359.

We turn next to the circumstances concerning Latoya exiting the interrogation room, leaving defendant to face interrogators alone. We begin by acknowledging the detectives did not initiate her decision to exit the room. Rather, Latoya herself first broached the subject by asking defendant, "[h]old on. Would you like me to step out?" Defendant responded, "[h]uh? Yeah."

In other words, this is not a situation where police deliberately excluded Latoya from the interrogation room, at least at the moment she elected to excuse herself from the ongoing interrogation. Cf. Presha, 163 N.J. at 318 (noting it would be "difficult for us to envision prosecutors successfully carrying their burdens in future cases in which there has been some deliberate exclusion of a

juvenile's parent or legal guardian from the interrogation"). The case law is clear that a parent or guardian may decline to be present at the interrogation. <u>Id.</u> at 317. Presumably, that decision may be made at any time, including during the course of an ongoing interrogation.

In <u>Q.N.</u>, the Court provided helpful guidance on this question, stating:

> [i]n sum, the record demonstrates that [the parent] voluntarily absented herself from the unrecorded portion of the interview. That circumstance qualifies as an exception to <u>Presha's</u> bright-line rule concerning interrogations of juveniles under the age of fourteen. We trust that, with the benefit of this opinion, the police in future situations will not suggest that the parent or legal guardian depart an interrogation area but will allow that suggestion to originate, if at all, from the accompanying adults themselves. <u>Similarly, we assume that the police will inform the juvenile that, once gone, the adult is available to return to the interrogation area during any part of questioning at the juvenile's request.</u>
>
> [<u>Q.N.</u>, 179 N.J. at 179-80 (emphasis added).]

In the present matter, defendant was <u>not</u> advised that he could ask for his mother to return to the interrogation room. Nor did the detectives advise Latoya she had the right to return. To the contrary, Diaz took her to another room and advised her to sign a consent form memorializing that she was waiving her right to participate in the interrogation. We note that while the form acknowledges that "my child can stop answering questions at any time," it does not advise that

the parent has the right to withdraw consent and either participate in the interrogation or direct that it be halted.[6] We add the detectives did not afford Latoya an opportunity to monitor the electronically-recorded interrogation, as occurred in Q.N., 179 N.J. at 169.

Aside from the consent form's deficiencies, Diaz's comments to Latoya after she exited the interrogation room effectively precluded any further opportunity for Latoya to serve as a buffer and advisor. Diaz told Latoya,

> [t]hey're still in the investigation like I said—I mentioned it when you were crying in there—and there was a reason why I said what I said because he obviously knows that what he's gonna say is gonna hurt you. And you knew that so you decided to get out of the room so now it's up to him to fess up and explain the reasons why this happened on the 11th, okay? If things got out of hand, then--then he's gotta pretty much say it. Okay?

Far from advising Latoya of her right to return to the interrogation room, the detective's comments endorsed Latoya's decision to exit the room to avoid being hurt by her son's admissions. Worse still, rather than reaffirming Latoya's role to safeguard defendant's right against self-incrimination, Diaz stated

---

[6]  Although the signed consent form is part of the record before us, the record does not indicate whether that form was drafted or approved by the county prosecutor or the Attorney General. It would be prudent, in our view, for the county prosecutor and Attorney General to review the form to address its deficiencies.

unequivocally, "so now it's up to [defendant] to fess up." It is hard to conceive advice more contrary to defendant's right against self-incrimination, or contrary to Latoya's role to safeguard that right. We conclude that the circumstances surrounding Latoya's decision to leave the interrogation room and the discussion she had with a detective in another room militate against a finding of voluntariness.

We note by way of summary that other circumstances that are relevant under the totality-of-the-circumstances test, such as age, whether the questioning was repeated and prolonged in nature, and whether physical punishment or mental exhaustion was involved, see Knight, 183 N.J. at 463, do not support defendant's contention we should reverse the denial of the suppression motion. However, the cumulative effect of the police missteps regarding Latoya's participation in the interrogation process is enough to create a reasonable doubt as to whether defendant knowingly and voluntarily waived his right against self-incrimination. We conclude the State did not meet its heavy burden of proof, thus requiring suppression of defendant's incriminating statements made after his mother left the interrogation room. We reiterate and stress no one circumstance is dispositive; rather it is the cumulative effect of the

31

limitations imposed on Latoya's participation that creates a reasonable doubt requiring suppression.

## VI.

We need only briefly address the request made by defendant and defense amici that we revamp New Jersey's existing juvenile interrogation jurisprudence by adopting a new categorical rule that juveniles must be provided counsel prior to waiving their <u>Miranda</u> rights. The thoughtful and comprehensive arguments raised by defendant and defense amici are substantially identical to the ones that were made in <u>M.P.</u> We decline to create a new per se rule barring uncounseled juvenile interrogations for the reasons we recently explained at length in <u>M.P.</u>, 476 N.J. Super. at 256-57, 265-70.

Moreover, in light of our decision to reverse the denial of the suppression motion and vacate defendant's guilty-plea conviction, we need not address his sentencing argument.

Reversed and remanded for entry of an order vacating the judgment of conviction. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION